### LONG v. LONG, *Appellant.*

1. **Pleading**: GENERAL DENIAL, SPECIAL PLEAS. This court is not prepared to say that in drawing an answer or reply counsel may not employ both a general denial and special pleas, but does hold that when both are employed the denials ought to be so framed as to leave no doubt in the mind of the court, and the adverse party, as to what is denied and what admitted. Hence, where a reply, besides pleading specially to an answer which contained numerous averments of fact in several counts, denied " each and every allegation of the answer not herein admitted or otherwise pleaded to: ' *Held*, that it was bad, because it imposed upon the court and opposing counsel the duty of going through the answer step by step to discover what was denied and what admitted. The plaintiff ought to have been compelled to make it more certain.

2. **A Question of Presumption.** A deed of trust, in evidence in this

Long v. Long.

case, given to secure the payment of several principal notes and interest coupons, bore date December 18th, 1875, and was delivered December 30th, 1875. It recited that the notes were of even date with itself, and were payable respectively in four, five and six years after date, with interest at the rate of ten per cent per annum from their respective dates, and also that "the first payment of interest on each of said notes is to be made on the 1st day of April, 1876, for the period ending on that day, and thereafter the interest is to be paid semi-annually on the 1st days of October and April in each year until the last payment, according to the interest coupons thereto annexed." It also appeared in evidence that all the interest was paid up to April 1st, 1877; and it being a material question what was the date of maturity of the next coupon, and none of the coupons being in evidence; *Held,* that it would be presumed that the next coupon matured either on the 18th or the 30th of December, 1877, rather than the 1st of October, 1877.

3. **Deeds of Trust, sale under.** A sale under a deed of trust given to secure the payment of a debt and authorizing sale when the debt is due, is absolutely void and passes no title if made before the debt becomes due.

4. **Obligations to Secure Loans of Foreign Corporations:** STARE DECISIS. If it were *res integra*, it ought to be held that any obligation given to secure the repayment of a loan of money made by any foreign corporation or unincorporated banking company in this State, is void. A true construction of the Banking and Illegal Currency Act requires such a holding. But since this court in the case of *The Connecticut Mutual Life Ins. Co. v. Albert*, 39 Mo. 181, decided in 1866, held otherwise, considerations of justice and good faith toward creditors who have dealt on the strength of that decision, forbid the application of this construction to them. Per PHILIPS, C.

HOUGH, C. J., and NORTON, J., adhered to the decision in *Conn. Mut. L. Ins. Co. v. Albert.*

HENRY AND RAY, JJ., expressed no opinion.

5. **Trustees.** No party interested in a debt secured by a deed of trust ought to be a trustee in the deed, nor ought the son of a party—certainly not without the debtor's knowledge of his interest and consent to his appointment.

*Appeal from Adair Circuit Court.*—HON. ANDREW ELLISON, Judge.

REVERSED.

*O. D. Jones* for appellant.

*Wilson & Cover* for respondent.

PHILIPS, C.—This is an action of ejectment for the recovery of about 470 acres of land. The answer is voluminous, containing many counts. It will only be necessary to a proper understanding of the opinion, to give the substance of the matters of defense.

The first count alleges that plaintiff claimed the land under a deed of quit-claim from one Goodman, who purchased at a trustees' sale made under a deed of trust given by defendant to C. H. and W. B. Bull, as trustees, to secure to L and C. H. Bull, of Quincy, Illinois, a certain sum of money; that by the terms of said trust deed the trustees were seized and empowered to convey, as "joint tenants, and not as tenants in common;" that although said trustees joined in the advertisement of the land for sale, only one of them in fact was present at and conducted the sale alone; whereat the said Goodman became the pretended purchaser, through L. Bull, one of the *cestui que trusts;* that the trustee who conducted the sale was the son of one of the beneficiaries in the debt secured, and conspired with the beneficiaries to sell said property in bulk and at an unseasonable hour, when no bidders but one was present, and he, one of the said Bulls, and that the property was sold at about one-third of its value; that afterward both trustees made the deed to said Goodman, falsely reciting therein that both trustees were present at and conducted the sale; that said Goodman was not present at the sale, and the deed was made to him fraudulently to make it appear that he was an innocent purchaser; that the said trustees were both interested in the debt, one as a party named, and the other as a silent partner.

The second count alleges that on and prior to the 18th day of December, 1875, the said *cestui que trusts* were doing business as bankers at Quincy, Illinois, and as such foreign bankers they opened an agency at Edina, in this State, in the office of Linville & Bowen as their agents, who were

appointed thereto by said banking association to make loans, etc., for them in this State, and did, through them, make loans of bank notes and money in this State to divers persons to the amount of $100,000, paying out the same by drafts and otherwise through their said agents; and did exact and charge large rates of usurious interest therefor; that defendant, through said agency, borrowed of said Bulls the sum of about $4,000, for which he gave the deed of trust aforesaid; that about the 27th day of November the said trustees proceeded to make the sale aforesaid as for a pretended forfeiture; that the plaintiff took said land from said Goodman under a quit-claim deed for the consideration expressed of $1. The answer then alleges that the said note and deed of trust are absolutely null and void because made in violation of the statute of this State, chapter 16 of Wagner's Statutes, entitled "Banking—Illegal Currency."

The next count alleges that when defendant consented to execute the said deed of trust it was with the understanding and in the belief that disinterested parties would be selected for such trustees; that said Bulls proposed that they would prepare the deed and notes, and forward same to their said agents at Edina, for signature and execution, that defendant is only an ordinary farmer, little comprehending the meaning of the numerous conditions put in said deed; that relying upon the honesty and good faith of said Bulls to place the name of suitable and disinterested trustees in said deed, he signed the same not knowing the relation of said trustees to the beneficiaries; that said Bulls inserted fraudulently, as trustee, the name of Charles H. Bull, one of the beneficiaries, by the designation of " C. H. Bull," to deceive the defendant, and put in for the other trustee, W. B. Bull, who is the son and nephew of the beneficiaries respectively; that said trustees were in collusion with the beneficiaries in said deception, intending to do their bidding in the matter of discharging said trust. The answer then proceeds to set out in detail how on the

day of the sale, the trustee, W. B. Bull, with his father, arrived from Illinois, rushed from the depot, and with out-cry, and no one present, at an unusual hour, put the land up, when the said L. Bull bid the same off at the amount of the debt and interest and costs; that said Bull then went to Illinois, and the two trustees joined in a deed to said Goodman, who thereupon made the quit-claim deed to plaintiff, who took with full notice, etc.

The next count sets up, that by the laws of Illinois the said banking concern were not permitted to take real estate security for such loans, and had no power thereto, etc.

The reply was made *in solido* to all the counts, and begun thus: "Now comes plaintiff, and for reply, says he denies each and every allegation in said answer not herein admitted or otherwise pleaded to." It then proceeded to set out the making of the loan of the $4,000, on the 18th day of December, 1875, and the delivery of the deed on the 30th day of December, 1875; that before the maturity of the notes the said Bulls, in the usual course of business for valuable consideration, sold and assigned said notes to said Goodman; that said transfer of said notes was before the breach of the conditions of the deed of trust. The reply then set up a subsequent sale of this property and the purchase thereof by plaintiff under another deed of trust, but as that occurred long after ouster laid, and this action was begun, it is not necessary to take further notice of it.

The defendant moved the court to strike out the reply for the reason, among others, that it is not responsive to the issues; that it neither confesses nor avoids; that it does not reply to each separate count; because the new matter constitutes no defense, and the answer is vague and uncertain and tenders no specific issue for trial. This motion was overruled, and thereupon the defendant filed motion for judgment on the pleadings. This the court also over-ruled.

So much of the evidence as is material to the decision of this case will be noticed in the opinion in its proper

connection. The court, sitting as a jury, found the issues for the plaintiff, and assessed the damages at $500, and monthly rents at $50. The defendant has appealed to this court.

I. The reply in this case is bad pleading and ought to be discouraged. The reply to new matter in the answer is similar to the answer to the petition, and it may contain a general or special denial. Vansant. Plead., 408, declares that the "code allows the defendant to elect whether he will answer by a general or special denial, and having elected he is bound by it. He cannot answer in both ways." *Dennison v. Dennison*, 9 How. Pr. 247, is cited in support. We are not prepared to say that both modes of pleading may not be employed in the answer or replication. But we do not hesitate to hold that when both are employed the denials ought to be so framed as to leave no doubt in the mind of the court and the adverse party as to what is denied and what is admitted. This course not only sharpens the issues, but it aids in the preparation of evidence and lessens expenses in bringing witnesses to meet matters not designed to be controverted at the trial. This reply says: "Plaintiff denies each and every allegation not herein admitted or otherwise pleaded to." Then what is admitted or otherwise pleaded to? To determine this the opposing counsel and the court must go through the pleading analytically, step by step, to discover what perchance may be admitted or denied. Bliss Code Pleading, section 331, says the pleader should so frame the denial as not to leave his adversary to thus hunt through the plea to see what is or is not therein "admitted." The object of pleading, especially under our code, is to form specific and definite issues of fact. When the answer, as in this case, tenders many issues of fact in different counts, affecting the integrity of plaintiff's title relied on as the basis of his recovery, he ought to answer all the allegations, either by denying or admitting them. The reply in this case is of a character which a party would employ who cannot conscientiously

deny certain averments, and yet lacks the open candor to admit, knowing its injurious effect on his cause if admitted. Hence, being in doubt as to the course of safety, he adopts a duplex kind of plea, half denying, half confessing, so that he may insist on a denial or an admission as the one or the other may serve him in an emergency on the trial. Such pleading is vicious, and should be rectified by motion. The court should have so far sustained the motion in this case as to have compelled the plaintiff to make certain what he denied and what he admitted. The case was tried on the merits, however, and we will so review it.

II.   The deed of trust in question recites that it was given to secure the payment of $4,000 represented by three promissory notes " of even date of this deed." The first note is for $1,000, payable four years after date; the second is for $1,500, payable five years after date, and the third is for $1,500, payable six years after date; all of said notes " being payable with interest at the rate of ten per cent per annum from their respective dates until due, and at the rate of ten per cent per annum after due until the principal sums are paid;" both principal and interest payable at the banking house of said Bulls, in Quincy, Illinois. It is then recited in the deed of trust " the first payment of interest on each of said notes is to be made on the 1st day of April, 1876, for the period ending on that day, and thereafter the interest is to be paid semi-annually on the 1st days of October and April in each year." It is thus perfectly clear that the provision making the interest payable on the 1st days of April and October of each year is not specified in the notes or coupons thereto attached, but is of the terms of the deed of trust alone, because the preceding part of the deed in describing the notes says they bear "interest at the rate of ten per cent per annum from their (the notes) respective dates." Their date is that of the deed of trust, which, as shown by the caption of the deed, is the 18th day of December, 1875, or if by the acknowledgment it would be the 30th day of December, 1875, and that, too, is the

day the answer alleges the deed was delivered. The trustees were authorized to sell on the default of the debtor to "pay any of the principal sums or any installment of the interest thereon at the respective times when each and every one of them shall become due and payable by the tenor and effect of said notes and said original interest coupons." The deed requires thirty days' notice of the sale to be given by one insertion in some newspaper of Knox county; sale to be made at the town of Edina. Neither the notes nor coupons were put in evidence by the plaintiff. The presumption of law is, (aside from the positive recital in the deed that the notes are "payable with interest at the rate of ten per cent per annum from their respective dates until due,") that the coupons bore the same date as the notes, as they represented the amount of the annual interest on the notes. And this presumption is furthermore to be indulged, because if the notes had shown on their face by the coupons the interest was to be paid twice inside of one year at ten per cent per annum, they would have been usurious and contrary to law on their face. Certainly so by the law of Missouri, where the contract was made, and if by the law of the place where made payable, the matter is to be tested, it does not help the plaintiff, for in the absence of proof as to what the law of the state of Illinois is on this subject, the common law would be presumed to be in force there. *Meyer v. McCabe,* 73 Mo. 236.

By the "terms and tenor" of the notes and coupons en the interest would not begin to run before the 18th day of December, 1875, if then. The evidence shows, without dispute, that the interest was all paid up to the 1st day of April, 1877. According to the "terms and tenor of the notes and coupons," there could not have been any default prior to the 18th day of December, 1877, which, under the provisions of the deed of trust, would have worked a breach of the conditions so as to authorize an advertisement and sale before the 17th day of January, 1878. Yet the pleadings and evidence show that the sale in question was made

on the 27th day of November, 1877. The sale was, therefore, void, and the trustees' deed passed no title. *Eitelgeorge v. Mutual House Building Ass'n*, 69 Mo. 55, and authorities cited. The instruction asked by the defendant at the conclusion of the plaintiff's evidence, in the nature of a demurrer to the evidence, should, therefore, have been given.

III. It is insisted by defendant, and argued with marked ability, that the note and deed of trust given to secure it are absolutely void, as having been made in contravention of the provisions of chapter 16, Wagner's Statutes, respecting banking and illegal currency. If this question were *res integra* and rested with me for determination, I should feel compelled to hold as requested by defendant. This phase of said statute came before this court for construction in the case of the *Bank of Louisville v. Young*, 37 Mo. 398. It is true the notes brought by the president of the bank and loaned in the State were principally of the issues of that bank. Section 14 of the statute of 1855, under which the decision was made, corresponds with section 9 of Wagner's Statutes. Wagner, J., in delivering the opinion of the court, said: " The obvious intention of the act was to exclude certain associations of persons, foreign corporations, from coming in competition with the authorized banking establishments of this State, and to prevent their circulating depreciated currency. And with this view it makes utterly void all bonds, bills or notes or other instruments of writing securing the payment of any money or bank notes loaned or advanced by any foreign corporation or unincorporated banking company situated or located, or which is doing business by its officers or agents, within this State." This question next came before this court in the case of *Connecticut Mutual Life Ins. Co. v. Albert*, 39 Mo. 181. Fagg, J., who delivered the opinion of the court, seemed to think the decision in the *Louisville Bank case*, *supra*, was justified by reason of the fact that the loan was made of notes of the bank's own issue. The conclusion

reached by him was, that the statute was aimed alone at the prevention of the circulation of depreciated bank currency in this State, and did not interdict foreign corporations and unincorporated banking companies from doing business as such within this State "with lawful money of the country."

With this opinion I have never been able to agree. It is, in my opinion, opposed to the plain letter of the statute, and is a substitution of the judicial mind for that of the legislative. The plain reading of the statute of 1855 in connection with the subsequent revisions, shows clearly that the legislature was dealing with two distinct subjects. One was the prevention of the circulation of illegal or depreciated currency in the State, and the other was to prevent foreign corporations and unincorporated banking companies from coming into competition with our home institutions in doing a banking business within this State. So the first five sections of the act dealt with the subject of currency, while the succeeding sections dealt with that of banking. The 7th section of the act of 1855, giving the banking business exclusively to the State bank and its branches, shows clearly what the legislature meant, and struck at in the succeeding sections. It is intolerable to believe that while the legislature thus smote every other corporation within the limits of the State "hip and thigh," save one, it intended to let in all foreign corporations and unincorporated banking companies by agents and otherwise, to do all the banking business they pleased without State or local license, and without contributing one dollar to the revenues of the State, provided only they dealt "in the lawful money of the country." No home corporation, save one, by the explicit language of the 7th section, was permitted to lend or collect the "lawful money of the country," but according to the learned judge all foreign banking companies in Illinois, and all the insurance companies of Connecticut might establish banking institutions in every county in the State, loan money and have the process

of the courts of the State to collect their notes and enforce their " instruments of writing " taken for their security.

The 6th section of that act should, on the rule of *noscitur a sociis*, be read in connection with the 14th section— the 9th of Wagner's Statutes. By that section the legislature declared that " all bonds, etc., or other instruments of writing, securing the payment of any money or bank notes loaned or advanced by any foreign corporation or unincorporated banking company, doing business by its officers or agents within this State, to such corporation or unincorporated banking company, or to any corporation or person, whether such bond, note, etc., or instrument of writing, be made payable or made to secure the payment of such loan of money, ('lawful money,' of course,) or bank note, etc., shall be taken and held as utterly void and of no effect." It does not make any difference that the bond or note or instrument of writing was made to secure " lawful money of the country," for the section uses both terms " money or bank notes." There is no room for construction, in my opinion. No distinction whatever is made in the sweeping phraseology of this section between depreciated currency and the " lawful money of the country." The legislature struck for the home bank, and they intended to bar the ports of the State against every foreign incorporated and banking craft, no matter under what colors it sailed. In the succeeding revisions of the statute, the 7th section and its corollaries were omitted, because the legislature desired no longer to protect the State bank. Other local banks were permitted, and the national banks came, under federal power and license, to occupy the field of currency and banking. But the other provisions of the statute were left in full-armed vigor, unshorn of one hair of their strength nor abated in one letter of the original purpose. And it is not unworthy of observation that since the currency of the country is now furnished by the general government in legal tenders and national bank notes, the necessity for the provisions of this statute, so far as it

pertains to the prevention of the circulation of a depreciated currency, has no practical office to perform. · And if this statute, as it to-day stands in our latest revision, has any practical office, it is toward the foreign corporations and banking institutions of other states. Judge Wagner recognized the true interpretation of this statute when he said, in the opinion herein named, that its " obvious intention was to exclude certain associations of persons, etc., from coming in competition with the authorized banking establishments of this State, and to prevent their circulating depreciated currency." He did not mean that the foreign institutions were prohibited if they came only to circulate depreciated currency. For he says it was to exclude them from " coming in competition with the authorized banking establishments of the State, and to prevent their circulating depreciated currency." It would have been the veriest nonsense to write about " competition with the authorized banking establishments of this State " in circulating depreciated currency—a thing utterly prohibited in the State and outlawed.

The foregoing is but an outline of the reasons which influence my construction of this statute. If the construction were now to be settled the argument is susceptible, in my opinion, of irrefragable demonstration. As to the suggestion in the case criticised, that a contrary construction would drive out of the State foreign capital, it would be a sufficient answer to say that it is not a judicial question. It is one solely of legislative policy. The ports of the State have ever stood wide open for individual capital, that which comes to seek profitable investment, to build up, and bless the community. But that which comes merely to take away what was brought with usurious exactions for its short tarry, is of questionable advantage to any community.

I am constrained from applying what I think is the proper construction of this statute to this case out of considerations of justice and good faith toward creditors. who

have, on the faith, perhaps, of a long accepted construction of a statute, made contracts and advanced money based thereon. The decision criticised was rendered in 1866. It has never been reversed. Nine years had elapsed since its delivery when this loan was made, and seventeen years have passed since it was declared to be the intent of the statute. Chancellor Kent said : "Even a series of decisions is not always conclusive evidence of what is law, and the revision of decisions very often resolves itself into a mere question of expediency, depending upon the consideration of the importance of certainty in the rule, and the extent of property to be affected by it." The principle is also well expressed by the learned and wise judge delivering the opinion in the *Ohio L. I. & T. Co. v. Debolt*, 16 How. (U. S.) 416 : " The safe and true rule is, that if the contract when made was valid by the laws of the State, as then expounded by all the departments of the government, and administered in the courts of justice, its validity and obligation cannot be impaired by any subsequent action of legislation or decision of its courts altering the construction of the statute." The proper limitation to the doctrine of *stare decisis* is, that when they can be used only as instruments of wrong and destruction " error ceases to be sacred, and principles and truth ought to be re-asserted." It is not improbable that large sums of money are similarly loaned in this State on the faith of the decision in the case referred to. The spirit of conservatism and good faith which should ever influence in the administration of justice, incline me to leave this matter as to existing contracts undisturbed. *O. V. & S. W. R. R. Co. v. County Court of Morgan County*, 53 Mo. 158.

IV. The trustees named in the deed of trust were parties directly in interest. They ought not, without the consent of the debtor, to have been trustees. The trustee acts for both parties. The law exacts of him the utmost good faith and strictest impartiality. He should, in the performance of his trust, have no personal interest to sub-

serve nor any friends to accommodate. The record in this case tends to show that the beneficiaries in this deed of trust inserted the name of one of themselves and the son of the other, (and he, an interested party in the debt,) without the knowledge of the defendant, or at least without his knowledge of their relation to the debt. The conduct of the trustee, who alone conducted the attempted sale, was not without criticism as to its fairness and manner. Both of the trustees, by reason of being non-residents of the State, are beyond the jurisdiction of the courts of this State, to whose chancery supervision such trustees in the exercise of their office should ever be subject. But, situated as the case now is, any further proceedings to effectuate the trust will necessarily have to be had through a court of equity where all these questions can be adjudicated, and any unfairness or unnecessary sacrifice of the property, if sale be made, be prevented or guarded against, under the supervising eye of the chancellor.

It follows, from the second ground predicated in this opinion, that the judgment of the circuit court is reversed. And it not appearing that any *supersedeas* was had and made in the case, the cause is remanded to the circuit court with special directions to restore to the defendant all things he may have lost by reason of the judgment rendered herein; and if it appear to the said circuit court from the writ, if any, of possession issued on said judgment, that the plaintiff has been placed in possession of the demanded premises, then the circuit court will at once issue its proper writ of restitution restoring the defendant to the possession of said premises, and then dismiss the plaintiff's action herein. All concur.

This opinion was adopted as the opinion of the court, and judgment was ordered to be entered accordingly; HOUGH, C. J., and NORTON, J., concurring in the result.

NORTON, J.—The plaintiff's right to recover in this

case was resisted by defendant on two grounds : 1st, That plaintiff, by virtue of the sale made under the deed of trust, acquired no title to the premises in dispute because at the time said sale was made no such breach of the conditions of the deed had occurred on the part of the grantor as under the provisions of said deed authorized a sale of the mortgaged premises.   2nd, That the note and deed of trust which was given to secure it, were void, because they were in contravention of the provisions of chapter 16, Wagner's Statutes, concerning banking and illegal currency.

I place my concurrence in the opinion reversing the judgment and dismissing the petition, on the sole ground that the first of the above defenses was clearly made out, as the evidence satisfactorily shows that by the terms of the deed of trust the sale of the land was wholly unauthorized at the time it was made, and the deed executed by the trustees in virtue of such sale, was for that reason ineffectual to pass title to the land sold.   The first of the above defenses being thus clearly established, it left plaintiff without any standing in court, and fully justifies the reversal of the judgment and the dismissal of the suit.

My concurrence does not extend to nor sanction the criticisms contained in the opinion (they being at most but expressive of the views of the writer), in respect to the ruling of this court in the case of *Connecticut Mutual Life Ins. Co. v. Albert*, 39 Mo. 181, where it was held that a foreign corporation not engaged in the business of banking, may lawfully make loans of its money in this State, and that such loans were not in contravention of the act relating to banking and illegal currency.   This was held with reference to a foreign insurance company doing business in this State.   The decision was promulgated in 1866.   Since that time, with this decision before it, the general assembly has enacted a very complete system of laws for the regulation of insurance companies, embracing both home companies and foreign companies doing business in this State, and I find nothing in these enactments which denies the

right either to home companies or foreign companies, doing business in this State, to loan money on real estate security; but on the contrary, many provisions which, if not expressly, by necessary implication, recognize such right. So the following sections of Revised Statutes: 6005, 6003, 6004, 5970, and kindred sections.

In the views herein expressed Hough, C. J., concurs.

## On Motions for Rehearing.

Henry and Ray, JJ.—These motions were filed out of time, but inasmuch as the judgment of the court is under its control until the adjournment of the term at which it is rendered, an error committed in a cause may be corrected at any time during the term at which it occurred. Our rule requires a party asking a rehearing, to file his motion within ten days after the rendition of the judgment, and, if filed within that time, it is our duty to consider it; if filed after that time has elapsed, it is at our option whether we consider it or not.

The judgment in this cause was clearly and distinctly based upon the ground that no default had occurred on the part of the mortgageor which authorized a sale of the mortgaged premises by the trustees named in the deed. This is the sole ground upon which the judgment was reversed.

Commissioner Philips, in his report, speaking for himself, states that "if this question were *res integra*, and rested with me for determination, I should feel compelled to hold, as requested by defendant, that the loan was in violation of the statute," etc., and then proceeds to make a brief argument in support of that view. By no just rule of construction can we, by our concurrence, be held to have decided any other than the precise question upon which the judgment was rendered, or to have ruled upon a question expressly excluded from the ruling by the opinion itself. We concurred in the opinion on the point decided, but gave no consideration to the other questions discussed by the com-

missioner.  With respect to those questions, no examination of the statute, or the decisions of this court construing it, was made by us, because we deemed it unnecessary to pass upon them, the decision being so distinctly based upon the other ground, relating to a breach of the condition of the mortgage.  The commissioner so guarded the expression of his opinion, so frequently declared that he but expressed his individual views, that we did not suppose that our concurrence would be construed as committing us to those views.  We had no occasion, as we then thought, to pass upon those questions.  It is certainly not now necessary to the determination of the cause, or of these motions, to do so.  We do not see how, upon these motions, those questions can now be considered as properly before us for determination.  The reasons why we did not, when passing upon the commissioner's report, consider them, are, in our opinion, of equal if not greater force to forbid it now.  We are entirely satisfied that a correct conclusion was reached on the question upon which the decision turned, and, therefore, think that the rehearing should be denied.

SHERWOOD, J.—I concur in overruling the motions for a rehearing on these grounds:  1st, There was no necessity for filing them, as it is quite apparent that in the opinion delivered no former opinion of this court was overturned. 2nd, One of the motions was filed out of time and by strangers to the record, and the other motion, though filed by a party to the record, was not filed in time.  3rd, A great clamor has been made about the opinion, and I am in favor of denying the motions on that distinct ground, regardless of all other considerations.  The days of any court ought to be numbered whenever it yields by the tithe of a single hair to any other considerations except those arising upon the record.