## HALE v. STIMSON, Appellant.

**In Banc, June 30, 1906.**

1. **ELECTION CONTEST: Pleading: Notice: Jurisdiction: Recount.** The notice of contest in election contest cases takes the place of a petition in an ordinary suit, and the service of the notice upon the contestee fills the office of a summons in an ordinary suit. The notice must be judged by the rules pertaining to the sufficiency of a petition, and, hence, must state a cause of action to give the court jurisdiction, or in order that a recount of votes may be legally had.

2. ——: ——: ——: **Sufficient Allegation: Grounds of Contest.** Allegations in the notice to contestee that "there were many other illegal and fraudulent votes cast for you at said election, the name or names of such voters, and the precinct or precincts wherein they voted, not being known to me at this time, I cannot specifically notify you of their names or of the precinct in which they voted," and that "there were many other legal and valid votes cast for me at said election that were not counted for me, but their names not being known to me, I cannot specifically notify you of their names or of the precinct in which they voted," do not state a cause of action. They are so indefinite and informal and so lacking in certainty and formality of substantive allegation of fact as to conceal, rather than inform, the contestee of the issues to be tried, and do not enable him to prepare his defense. They do not, therefore, fill the office of a petition. No "grounds" for the contest are stated in said averments.

3. ——: ——: ——: ——: ——: **Recount: Certificate.** Where no grounds of contest are stated in the notice in an election contest, the county clerk has no authority to recount the ballots.

4. **ELECTIONS: Qualified Voters: Soldiers at State Home: Residence: Intention.** Section 7 of article 8 of the Missouri constitution, in declaring, "For the purpose of voting, no person shall be deemed to have gained a residence, or lost it by reason of his absence . . . while kept in a poor house or other asylum at public expense," is not a disfranchising provision, but its force is spent on the question of residence. An inmate of a soldiers' home is not precluded thereby from gaining a residence at the home, provided he had a bona-fide intention to do so; and that intention may be proved by competent overt acts, in the same way residence is proved for election purposes generally.

Hale v. Stimson.

5. ———: ———: ———: Asylum and Poor House: Statute. Section 8 of article 8 of the Constitution says that "no person, while kept at any poor house or other asylum, at public expense, nor while confined in any public prison, shall be entitled to vote at any election under the laws of this State;" and the Legislature, at the same time it by statute accepted the old Soldiers' Home at St. James and the Confederate Home at Higginsville and agreed to maintain them, amended sec. 6994, R. S. 1899, by providing that no person while kept at any poor house or other asylum at public expense, "except the Soldiers' Home at St. James and the Confederate Home at Higginsville," shall be entitled to vote at any election under the laws of this State. *Held,* first, that the words "or other asylum," used in the Constitution, belong to the same class as "poor house;" *second,* the Legislature, by the amendment to section 6994, did not by legislative construction place the Soldiers' Home and the Confederate Home in the same class as "poor house or other asylum," for the salient thought in the legislative mind was to say who should and who should not vote; *third,* the word "asylum" as used in the Constitution does not include the Soldiers' Home and the Confederate Home, and therefore the statute is not unconstitutional; and, *fourth,* the inmates of those homes, if otherwise qualified, are entitled to vote.

6. ———: ———: ———: ———: Public Expense. In that the State in agreeing to maintain the Soldiers' Home accepted with it 53 acres of land and other property, and with the Confederate Home 362.86 acres and other property, it will be held that the privilege of the soldiers to a home there in the evening of their days at "public expense," was bought and paid for at great price —the services they and their comrades rendered, and the widow's mites that passed into the public chest. At any rate, the sufficiency of those things as a consideration for the State's agreement to maintain the old soldiers will not be decided in such a way as to deprive them of the right to vote in an election contest.

7. ———: ———: ———: Entitled to Vote. The soldiers of the Soldiers' Home at St. James and of the Confederate Home at Higginsville ,are not disqualified from voting by reason of the fact that they are inmates of those homes.

8. ASYLUM: Eleemosynary Institution. Poor houses and asylums may be eleemosynary institutions, but there are many such institutions which are neither poor houses nor asylums.

Appeal from Phelps Circuit Court. — *Hon. W. N. Evans,* Judge.

REVERSED AND REMANDED (*with directions*).

*Arthur P. Murphy, Charles H. Shubert* and *James B. Harrison* for appellant; *L. F. Parker* of counsel.

(1)   Section 8 of article 8 of the Constitution should not be construed to disqualify the inmates of a Soldiers' Home, but the disqualification should be confined to persons "kept at a poor house," or some "other asylum" of the same class as a "poor house," at public expense, upon the principle of *ejusdem generis;* in other words, the term "other aslyum," being a general term, following particular words, will be confined in its application to asylums of the same class as a "poor house." 2 Lewis's Sutherland, Statutory Construction (2 Ed.), secs. 422 to 435; Ex parte Hill, 3 C. & P. 225; Sandiman v. Breach, 7 C. & B. 96; St. Louis v. Laughlin, 49 Mo. 559; St. L. A. & M. Assn. v. Delano, 108 Mo. 221; State v. Dinnisse, 109 Mo. 434; State v. Schuchmann, 133 Mo. 123; State v. Krueger, 134 Mo. 269; State v. South, 136 Mo. 673.    (2)   The rule or doctrine of *ejusdem generis* applies to statutes affecting only civil rights and duties with equal force as to criminal or penal statutes. 2 Lewis's Sutherland, Statutory Construction, sec. 422; Ruckert v. Railroad, 163 Mo. 260.    (3)   A "poor house" is a refuge for aged, infirm, lame, blind or sick persons who are unable to support themselves, and has a superintendent, who has the power to coerce persons kept at such house to perform labor. Secs. 8994, 9001, 9002, R. S. 1899.  (4)   No Federal Soldiers' Home was in existence at the time of the adoption of the Constitution of 1875, the statute establishing the same not having been passed till 1897, and when created it is called, not a poor house, or an asylum, but a "home," a word evidencing an intention that the place of refuge given to these "disabled and indigent soldiers and sailors" shall be in a class not only different, but superior to the ordinary poor house. R. S. 1899, sec. 7797; Laws 1897, p.

28. (5) General words following particular words in a statute will never be construed to include any of a class superior to that to which the particular words belong, for if it had been the intention of the Legislature to include any of such superior class, the members of such superior class would have been first mentioned, and they cannot be implied. 2 Lewis's Sutherland, Statutory Construction (2 Ed.), sec. 435; Ambler v. Whipple, 139 Ill. 311; Casher v. Holmes, 2 B. & Ad. 592. (6) The same Legislature that established the Federal Soldiers' Home and the Confederate Home gave unmistakable expression to its intention that the inmates of these homes should not be deemed to belong to the same class as those who are kept at the ordinary "poor house," and clearly intended to enact that the fact that they were such inmates should not operate to disqualify them from voting. R. S. 1899, sec. 6994; Laws 1897, p. 109; 2 Lewis's Sutherland, Statutory Construction (2 Ed.), sec. 443. (7) Whatever the particular language of the Legislature may be, it is the duty of the court to ascertain from that language the result intended to be accomplished, and to so construe the statute as to accomplish the result intended, even if necessary to depart from or ignore the exact words of the statute. 2 Lewis's Sutherland, Statutory Construction (2 Ed.), secs. 347-348. (8) A statute will not be held unconstitutional unless clearly and unmistakably in conflict with some constitutional provision, and if the end sought to be accomplished by the Legislature, as gathered from the act, is within the power of the Legislature, or if a reasonable doubt exists whether the legislative intent is violative of the organic law, then the intent of the Legislature must be given effect and the act is valid. 1 Lewis's Sutherland, Statutory Construction (2 Ed.), sec. 83; State v. Mason, 153 Mo. 23; Powell v. Sherwood, 162 Mo. 605.

*Joseph J. Crites* and *Watson & Holmes* for respondent; *Sherwood & Young* of counsel.

(1)   The doctrine of *ejusdem generis* has been invoked in this case.   Webster defines the term "asylum" as "any place of relief and security," as "an institution for the protection or relief of some class of destitute, unfortunate, or afflicted persons; as, an asylum for the aged for the blind, or for the insane; a lunatic asylum; an orphan asylum."   This word is of similar signification with "almshouse," "a house appointed for the use of the poor; a poor house."   Section 8994, Revised Statutes 1899, describes the poor to be "aged, infirm, lame, blind or sick persons, who are unable to support themselves."   Section 7797, Revised Statutes 1899, declares that the "home" required by that section to be established is to be "for disabled and indigent soldiers and sailors and army nurses who enlisted, served or participated in the Mexican war and the war of the Rebellion for the preservation of the United States, and also the aged wives of such soldiers and sailors."   Laws 1897, p. 28.   This shows that institution to be strictly an eleemosynary one in its character.   The Constitution of 1865 in section 10 of article 2, said that for the purposes of voting no person should be deemed to have gained or lost a residence by reason, etc., . . . . nor while a student in any seminary of learning, nor while kept at any poor house or other asylum at public expense, nor while confined in any public prison.   The same language in all essentials is employed in section 2 of article 8 of our present Constitution.   Not satisfied with the above provisions, the framers of the latter instrument declared: "No person, while kept at any poor house or other asylum at public expense, nor while confined in any public prison, shall be entitled to vote at any election held under the laws of this State."   Sec. 8, art. 8, Const.   This section manifests in an especial

manner that the framers of that section were determined that they would absolutely prevent some of those named in the preceding section as not having gained or lost a residence, to-wit, those "kept in a poor house or other asylum at public expense, nor while confined in any public prison," from voting at all. If this was not the design of the framers of that section, then they used singularly inapt and inept language to convey the idea of the contrary purpose. Right in the face of this mandatory and prohibitory declaration of the organic law the Legislature enacted section 6994, R. S. 1899, which, among other provisions, contains this proviso: "Provided, further, no person while kept at any poor house or other asylum at public expense (except the Soldiers' Home at St. James and the Confederate Home at Higginsville) nor while confined in any public prison shall be entitled to vote at any election under the laws of this State," etc. This very exception recognizes and declares that the soldiers at the "Home" at St. James and at the "Home" at Higginsville are kept at a poor house or other asylum at public expense. Such exception cannot stand unless the Constitution falls. (2) Nothing is better settled than that constitutions, as well as statutes, are to be deemed and adjudged prospective alone in their operation, unless on their face there appears something manifestly contrary and inconsistent with such ideas. Cooley's Const. Lim. (6 Ed.), 77, 445; State v. Grant, 77 Mo. 113; Leete v. Bank, 115 Mo. 184; State v. Julow, 139 Mo. 163. That section, in its exception clause aforesaid, is a local and special law; local because it alone can operate as to two counties in the State, and special because it operates not on a whole class, but on a number of persons segregated from that class (Henderson v. Koenig, 168 Mo. 372), and is, therefore, forbidden by section 53, article 4, Constitution. Earle v. Board, 55 Cal. 489; Cricket v. State, 18 Ohio St. 22; State ex rel. v. Judges, 21 Ohio St. 11; Devile v. Comrs., 84 Ill. 590; Kerrigan v. Force, 68 N.

Y. 381; Gaskin v. Meek, 42 N. Y. 186; King v. State (Tenn.), 3 L. R. A. 210. General laws are those which bind all within the jurisdiction of the law-making power. People v. Cooper, 83 Ill. 585; City v. Clark, 68 Mo. 588; State ex rel. v. Herrmann, 75 Mo. 340.

LAMM, J.—In obeying the order of this court to formulate its pronouncement in this cause, a meed of credit is due at the threshold, to be likened to and read as an inscription over a gateway. That meed of credit is this: the labor of the writer has been made light and pleasing by the research and erudition of our Brother MARSHALL, who (going on before as a pioneer in the path of investigation), has not only blazed the way but left map, survey and memoranda of his route — the ultimate conclusion reached by him, on the main question, the old soldiers' vote—being adopted.

Hale and Stimson were opposing candidates in the general election of 1904 for the office of collector of the revenue in the county of Phelps. Stimson was declared elected on a canvass of the poll-book returns; he received a majority of 41 votes, it seems. Having (presumably) received his commission, qualified and entered on the performance of his official duties, in due time Hale brought proceedings of contest by causing to be served on Stimson the following notice:

"To William Stimson, Sr., Contestee:

"You are hereby notified that I will, at the next regular term of the circuit court within and for Phelps county, Missouri, to be begun and held at the court house in the city of Rolla in said county of Phelps and State aforesaid, on the 3rd Monday of March, 1905, contest your election to the office of collector of the revenue of Phelps county, Missouri, to which office you claim to have been elected at the general election for state and county officers held in Phelps county, Missouri, on the 8th day of November, 1904, for the following reasons, namely:

"1.  Because at said election you and I were opposing candidates for said office of collector of the revenue of Phelps county, Missouri, and at said election I received a majority of the legal votes cast, and was thereby duly elected to said office.

"2.  Because at said election I received of the whole number of votes cast for said office, 1,418 legal votes, and you received 1,341 legal votes, being a majority in my favor of 77 legal votes, thereby duly electing me to said office.

"3.  Because at said election, G. W. Steen" (here follows a list of many voters by name) "voted for you and their ballots were wrongfully and illegally counted for you for said office, and at said time all of the above-named parties were inmates of the Federal Soldiers' Home of Missouri located at St. James, Phelps county, Missouri, and were at that time then and there kept and maintained in an asylum at public expense by the people of the State of Missouri, by appropriations made by the General Assembly of the State of Missouri, by reason of which all of the above-named persons were not legal voters at said election; were not qualified voters at said election; and were not entitled to vote under the Constitution and laws of the State of Missouri, and their votes should not be counted for you, the said contestee, and against this contestant, and should be declared void, and of no effect and for naught held.

"4.  Because there were many other illegal and fraudulent votes cast for you at said election, the name or names of such voters, and the precinct or precincts wherein they voted not being known to me at this time, I cannot specifically notify you of their names or of the precinct in which they voted.

"5.  Because there were many other legal and valid votes cast for me at said election that were not counted for me, but their names not being known by me, I cannot now specifically notify you of their names or of the precinct in which they voted.

"6. Because I am now and was at the time of said election, a resident of Phelps county for more than one year, and was then and there over twenty-one years of age, and qualified in every regard to hold said office.

"When and where you can be present if you so desire."

Presently, Hale applied to Cowan, clerk of the circuit court, for an order of recount (R. S. 1899, sec. 7044) directed to the county clerk, Rucker, and in vacation Cowan issued the following order:

"In the matter of the contest between:

"A. B. Hale, contestant, v. William Stimson, Sr., Contestee.

"A contest for the office of Collector of the Revenue of Phelps county, Missouri.

"The State of Missouri to B. H. Rucker, Clerk of the County Court of Phelps County, Missouri, Greeting:

"Whereas an election contest has arisen in said county of Phelps between the parties aforesaid for the office aforesaid:

"And, whereas, the contestant has applied to me, David E. Cowan, the undersigned clerk of the circuit court of said county of Phelps in vacation, for a writ under the provisions of section 7044, Revised Statutes of 1899.

"Now, therefore, this writ is to command you, the said B. H. Rucker, clerk of the county court of the county of Phelps aforesaid, that you proceed to open, count and examine the ballots in your said office of county clerk of Phelps aforesaid and that you compare said ballots with the list of voters in your office; which said ballots were cast at an election in your said county Phelps, and in all and singular, the various precincts thereof, on the first Tuesday after the first Monday, in November in the year 1904, for the office of collector of the revenue of said county.

"And that you will make return to this writ under your hand and official seal, of such count, comparison and examination of said ballots with said list of voters, so far as the same relates to the said office in contest to the said circuit court of Phelps county, Missouri.

"And that if you find and are satisfied, that any person voting at the election in contest aforesaid for the candidate to fill said office, was not at the time of such voting a legal voter by reason of the fact that he was then kept at a poor house or other asylum at public expense, or at a soldiers' home, under the provisions of section 7797 and 7798, you will strike the names of such persons from the list of legal voters voting at said election for such candidate and state the reason of such action in your return to the circuit court and that in your return you do set forth and certify all the facts which either of said parties to said contest may desire, which may appear from said ballots, affecting or relating to said office in contest."

Under the foregoing order, Rucker made a general recount of the votes cast in Phelps county and, by way of return to the order, certified Hale elected by a small majority. Subsequently, as we gather, a new order was made by the court directing a recount and re-certification of the vote of St. James township in which was located the Federal Soldiers' Home, and which recount pertained somewhat to the votes of the inmates of said Home.

The judgment, *nisi*, ousted Stimson from (and installed Hale in) office, and Stimson appealed—the votes of the inmates of the Soldiers' Home being rejected; and the findings otherwise being of such scope and character that it is made to appear that by rejecting the old soldiers' vote, on one hand, and by accepting the certificate of the county clerk on the general recount, on the other, Hale is entitled to the office; but if the general recount be rejected and the votes of the inmates

of the Soldiers' Home be accepted, then Stimson is elected.

Appellant's abstract is furnished in piecemeal and his briefs are somewhat inartificially arranged, so that it cannot always be determined what is abstract, what is mere comment, and what is intended for brief proper. It may be said, however, *ex gratia,* that an assignment of errors is made here covering the following grounds:

(a)   That the court erred in excluding testimony.

(b)   That the ballots had been first exposed in unsealed bags in the office of the county clerk and then kept in a vault that could not be locked for a time and, therefore, the court erred in accepting the general recount of the county clerk; and, further, that the certificate of the county clerk had no vitality because he subcribed $50 to promote the litigation, thereby becoming, *pro tanto,* a party to the proceeding.

(c)   That the increase of forty-three votes shown by the recount in favor of Hale in one precinct (Edgar Springs), casting an aggregate of 169 votes on the office in dispute, coupled with other circumstances, also showed that the integrity of the ballots had not been preserved. Therefore, the court erred in admitting the clerk's certificate based on such ballots.

(d)   That the court erred in not rejecting the general recount of all the precincts except, possibly, the recount of the votes at the St. James precinct (where the old soldiers voted); and this because the notice of contest was insufficient.

(e)   That the court erred in rejecting the old soldiers' vote.

In substance, the motion for a new trial, *inter alia,* directed the trial court's attention to the errors formulated above.

In the view we take of this record, assignments of error, a, b and c, do not necessarily become of the essence of this case on appeal, for as much as in our opinion, in the rational evolution of the matter, the

case ought to be disposed of before those assignments of error (however meritorious they may be) are reached; hence, they may be put to one side as by-matter; and this disposition of said assignments of error, a, b, and c, renders unnecessary any statement of the facts and evidence upon which they are predicated; and, moreover, to all intents, makes the issue one of law—there being no evidence the old soldiers were not of voting age, citizens of Missouri, residents of Phelps county and of St. James precinct, and the case being presented by both sides on the theory that they were inmates of the St. James Soldiers' Home.

I. Assuming the notice of contest in the third paragraph, relating to the old soldiers' vote, is sufficient in form; and assuming there was jurisdiction to make a recount of the St. James precinct (the *situs* of the Home), did said notice set forth facts constituting grounds of contest in any of its other paragraphs? In other words, was there any authority to make a general recount of all precincts, or to base a judgment upon such recount of votes other than those cast at the St. James precinct? And herein (as a secondary consideration) was the order made by the circuit clerk a valid order?

(1) Under our method of contesting elections, the notice of contest takes the place of a petition in an ordinary suit, and the service of this notice upon contestee fills the office of a summons in an ordinary suit. [Castello v. St. Louis Circuit Court, 28 Mo. 259.] This must be taken as settled law; because, in banc, after oral argument by distinguished counsel and upon briefs profoundly treating the matter from the standpoints of the philosophies and analogies of the law, the Constitution of this State and of the United States, and adjudicated cases, it was finally determined by a united court that such notice of contest fills the office of a petition, and its service the office of a summons. [State ex rel.

198 Sup—10

Wells v. Hough, 193 Mo. 615.] The notice of contest therefore, must be judged of by the rules pertaining to the sufficiency of a petition, and, hence, must state a cause of action to give the court jurisdiction, or in order that a recount of votes may be legally made. [State ex rel. Funkhouser v. Spencer, 164 Mo. 23; s. c., 166 Mo. 271.]

It has been held that legislative enactments affording the remedy and prescribing the scheme for election contests are somewhat of a code unto themselves. By Revised Statutes 1899, section 7029, it is enacted that "the notice shall specify the grounds upon which the contestant intends to reply." Now, in the case at bar, the third paragraph of Hale's notice would seem to present an allegation of issuable facts. But, as to the other grounds, it is not alleged any legal votes were cast for contestant and counted or returned for contestee. It is not alleged specified mistakes were made in favor of Stimson and against Hale by the judges and clerks in counting the votes, or otherwise. There is no specific allegation directed to any specific precinct in Phelps county (except that of the Soldiers' Home) pointing out any specified irregularities, frauds or mistakes. In other words, the poll-book returns, the returns forming the substratum of a legal right to an elective office, the returns made by judges and clerks, presumably honest men, presumably appointed according to law and therefore presumed to represent the two leading political parties in the general election of 1904 —the returns made by those humble officers who on election day under each other's eye, ballot by ballot, took in the votes, who handled these votes one by one, who looked the electors in the face, who counted the votes, who presumptively knew the electors as neighbors, whose simple duty it was under the due guard of their newly-made oaths to see to it that count and return told the truth, nothing but the truth, and all there was of it—none of these returns and figures were

attacked, falsified or surcharged by specific allegation in the notice of contest. This being so, it seems an elementary proposition in the science of pleading that such grounds set forth no cause of action; because they are so indefinite, informal and so lacking in certainty and formulation of substantive allegation of fact as to conceal, rather than inform, Stimson of the issues to be tried, and do not fill the office of a petition, to-wit, enable him to prepare a defense.

Apposite to this conclusion, it may be said that the anxious judicial solicitude brooding over the preservation of the integrity of the constitutional guaranty of the secrecy of the ballot, and the consequent judicial tendency to apply a sensible standard in measuring the sufficiency of a petition in an election contest, find no sharper example than in State ex rel. Funkhouser v. Spencer, 164 Mo. 23, in an opinion written by MARSHALL, J.—followed by another opinion written by the same learned Judge in the same case. [166 Mo. 271.]

It is true that "every court authorized to determine contested elections shall hear and determine the same in a summary manner, without formal pleading . . . ." [R. S. 1899, sec. 7033.] It is true that, following the analogies of the law, amendments might be grafted on, provided there was a parent stock upon which to graft, but in this case there was no amendment and (though that question is not here) apparently nothing to amend by. In this case the petition, i. e., the notice of contest, is so drafted that if a pleader would imitate it in any other form of action, it should be held waste paper in any court of record.

The statutes require the "grounds" to be stated— grounds (in the law) can only mean substantive averments—informal, maybe, but yet in plain terms setting forth a cause of action upon which issue may be joined and which may, at least, tend to notify contestee of the charges he must face. Upon what theory can mere conclusions, such as constitute some of the framework of

this notice, be considered issuable averments? As to the rest of the framework, oddly enough, it is built on ignorance—lack of knowledge. The description of unknown voters by name, color, size, or other earmarks —the precincts where they cast their votes, diligence to ascertain a description of name, number or precinct —all are unknown, unaverred and left in impenetrable fog—and this, *ex industria*.

To open all the ballot boxes of Phelps county for a general recount under the averments of this notice of contest was a leap in the dark—a shot in the bush—was to use the proceeding as a *quasi*-bill of discovery based on fishing generalities, in the hope, apparently, some culpable thing might be hooked in the depths of the great unknown and unseen and brought to the surface of the seen and known.

Adjudications elsewhere may be conceded to be no controlling force on a mere question of pleading and of small persuasive authority because of vital differences in statutory schemes of election contests; but the statutes of some of our sister States are very similar to our own, and their highest courts have steadily applied, not technical and nice, but sensible rules of pleading. For instance, in Borders v. Williams, 57 N. E. 527 (supreme court of Indiana), an illuminating case throughout and and directly in point, two of the syllabi are as follows:

"1. Under Burns' Rev. St. 1894, sections 6312, 6314, providing for the contest of elections on certain grounds, and requiring the contestor to present a written statement specifying the grounds of contest, an averment as a ground of contest that contestor received more votes than the contestee is insufficient, as tantamount to a general averment that the judgment of the county board of canvassers was erroneous.

"2. Where, in an election contest, the issues joined are the board's failure to count for the contestor certain votes from a certain precinct, it is error for the court to receive and count for contestor other ballots re-

Hale v. Stimson.

jected in another precinct, which was not within such issues.''

It was said in that case: ''We perceive no ground for the contention that in contested election cases the procedure is more liberal than in the trial of other civil causes with respect to the issues and evidence. The statute requires the contestor to specifically state in his complaint the grounds of contest relied upon. That he shall therein state all the grounds he depends upon is emphasized in the provision that requires him to serve a copy of the specifications upon the contestee, manifestly that the contestee may have timely notice of the particular facts against which he is called upon to defend his title. We concede that under proper issues the controlling question in such cases is, which of the contestants has received the greater number of legal votes? But we are not prepared to grant that the statute and settled rules of practice may be so far disregarded as to hold that a single ground of contest properly pleaded is sufficient to open up to adjudication other substantially different grounds without plea. Such a rule would invite loose and imperfect pleading, and give no warning to a contestee before trial of the real grounds upon which his case was liable to be determined.''

In Whitney v. Blackburn, 21 Pac. 874 (an Oregon case), riding off on a question of pleading, the statute seems to have been that any person wishing to contest ''may give notice in writing, to the person whose election he intends to contest, that his election will be contested, stating the cause of such contest briefly,'' etc. —and seems to be equivalent to our own. The court in that case said: ''The 'cause' of such contest is his cause of action—the wrong committed. It is the fact or combination of the facts which give rise to his right of contest or of action, as the case may be. In the complaint these are to be plainly and concisely stated, and in the notice briefly stated. But in either case the

facts must be stated. To state them briefly necessarily implies that they shall be stated sufficiently plain as to advise defendant of the 'cause' for which his election is contested.'' In that case the rule laid down by THOMPSON, J., in Mann v. Cassidy, 1 Brewst. 26, 27, was quoted with approval, viz: ''The rule must not be held so strictly as to afford protection to fraud by which the will of the people will be set at naught, nor so loosely as to permit the acts of sworn officers,chosen by the people, to be inquired into without adequate and well-defined cause.''

In the Whitney case, it was further held that certainty is required, but that technical precision of averment was not required, the court saying that only that degree of certainty in the statement of facts was necessary ''as will serve to notify the adverse party of the particular cause upon which the contest is founded. As the object of the notice is to inform the other party of the substance of the facts relied upon to defeat his claim, when the words used therein, taken in their ordinary sense, fairly serve this purpose, it is sufficient.'' The court further comments on the fact that there was no averment that defendant was declared elected, or that he received a certificate of election. And right here it may be said that no such averment appears in the notice in the case at bar. How, may it be asked, could there be an election contest or judisdiction to entertain one unless the contestee received a certificate of election and is actually installed in his office? But waiving that and returning to the Whitney case, the court further said: ''The wording of the notice indicates, as was asserted at the argument, that the plaintiff did not know of a single error or illegal vote cast, but stated the facts broadly and generally, because he was unable to point out, or to be reasonably specific and certain, as to any point in his notice, or as to any irregularity of whatever kind upon which to rely, or other fact to sustain his claim. . . . . While it is the duty of courts to

disregard mere technical rules or defects, and to liberally construe the law that the rights of the people may be preserved, and that no protection may be afforded to fraud, yet he who undertakes to contest the right of another to an office, to which he has been declared to be elected, by a tribunal chosen by the people, ought to have some well-defined 'cause,' and to notify or inform the other party of the substance of the facts upon which he relies to defeat his title and to authorize the court to make the inquiry."

The foregoing quotations sufficiently illuminate the point in hand; and to the same effect, showing that the notice in this case was worthless as a pleading (barring the third ground), are Lehlbach v. Haynes, 23 Atl. 422 (a N. J. case); Todd v. Stewart, 23 Pac. 426 (a Colo. case); Edwards v. Logan, 69 S. W. 800 (a Kentucky case).

In the Todd case it was said, among other things, that:

"The petition under consideration does not state the total number of votes cast in the county for the office in controversy at the election named, nor the total number of votes polled in either or all of the six precincts complained of. It does not state the number of candidates in the field for said office, nor the number of votes given for either of the candidates. It does not state, or attempt to state, the number of electors who were prevented from casting their ballots for contestor by reason of fraud, intimidation or other misconduct. It does not even specially aver that the board of canvassers considered or counted the returns from the six precincts objected to. In short, there is a total absence of averment tending to show that the matters complained of altered the result of the election. The mere declaration in the pleading that the contestee was not elected, and that contestor is entitled to the office, does not supply the foregoing omissions."

(2) Before passing this branch of the case, the order of recount is entitled to judicial attention. Of this order, two things may be said. The first is, it bears earmarks of having been prepared by counsel, and the particularity used in dealing with the votes of the Soldiers' Home is not entirely without significance upon the question heretofore under exposition. The remarkable features of that order, in so far as it directs the county clerk to discard the votes of the inmates of the Soldiers' Home, will bear the construction that, in the mind of respondent's counsel, the soldiers' vote was the vital question in making the order of recount as it was in drafting the notice of contest.

In the second place, that order might well be held irregular and void under the reasoning of repeated adjudications of this court. And this is so, because it omits safeguards of the secrecy of the ballot upon which stress is laid by those adjudications. For example, see State ex rel. Fulkhouser v. Spencer, supra; State ex rel. Wells v. Hough, supra. If the rule announced in those cases is to be applied as a general one, there is scant escape from the conclusion that this order was in the teeth of the law. If so, then a legal wrong must first be held a foundation upon which to build a legal right before a recount of ballots under color of this order can stand; since figs do not grow on thorns in the law, nor sweet waters flow from bitter fountains there, any more than elsewhere.

For the forgoing reasons, we hold that (barring the third paragraph) the notice of contest stated no "grounds" of action and gave no jurisdiction for a recount of any votes except those cast at the St. James' precinct. And it is the individual opinion of the writer that the order to reopen and to recount the votes of the St. James precinct was void under the adjudications of this court hereinbefore cited, provided they are to be followed and applied as an unbending rule.

II.    It is contended with confidence by the distinguished counsel appearing for Hale that the old soldiers kept at the St. James Home are disfranchised by the Constitution of this State, and this under wise maxims of hermeneutics.

The constitutional provisions leaned on are sections 7 and 8 of article 8.

Section 7 declares thus: "For the purpose of voting no person shall be deemed to have gained a residence by reason of his presence, or lost it by reason of his absence while  . . . nor while kept in a poor house or other asylum at public expense  . . . ."

Section 8 reads: "No person, while kept at any poor house or other asylum, at public expense, nor while confined in any public prison, shall be entitled to vote at any election under the laws of this State."

The legislative outgrowth of these constitutional roots is found in Revised Statutes 1899, section 6994, under the head of "qualifications of voters." In the proviso thereof, the right to vote is denied to an officer, soldier or marine in the regular army or navy of the United States. Following that denial, this appears: "and provided further, that no person while kept at any poor house or other asylum at public expense, *except the Soldiers' Home at St. James and the Confederate Home at Higginsville,*  . . .    shall be entitled to vote at any election under the laws of this State . . . ."

The clause in italics, excepting from the sweeping denial of the elective franchise the inmates of the Federal and Confederate Homes, was added by way of amendment in 1897 (Laws 1897, p. 109), was carried forward in the next revision and was live law at the date of the election in question.

The General Assembly enacting that amendment passed two other acts (Laws 1897, pp. 26, *et seq.*)—one of them pertaining to the Confederate Home at Higginsville, the other to the Federal Soldiers' Home at St. James.    They are twin enactments containing the

same provisions, *mutatis, mutandis*, having the same *motif*—the one, taking unto the State the ownership and management of an existing Confederate Home at Higginsville, the other, an existing Federal Soldiers' Home at St. James. At one home, the infirm and indigent ex-confederate soldiers and sailors, their wives, widows and orphans had been maintained by private beneficence and were to be thereafter maintained by the State. At the other, there had been maintained by private means the disabled and indigent soldiers engaged in the civil war for the preservation of the union of the United States, and their aged wives, and thereafter these were to be maintained, as well as those who served and participated in the Mexican war, by the State. By the one, it was contracted that the Confederate Home should be maintained for a term of twenty years, or so long as shall be needed for the purposes of the act, and the consideration was the absolute transfer to the State of 362.86 acres of land near Higginsville in Lafayette county, less a cemetery lot. The other act was also contractual in character and based on the consideration of the transfer by the ''Woman's Relief Corps Soldiers' Home'' of a good and sufficient conveyance of 59 acres, more or less, in or near St. James in the county of Phelps. By the one, there seems to have been no limitation on the discretion of the board of managers to admit occupants to the Confederate Home, except, generally, that such occupants should be infirm and indigent ex-confederate soldiers and sailors, their wives, widows and orphans. By the other, there was a restriction, to-wit, the soldiers and sailors were required to be citizens of the State of Missouri who were honorably discharged from the service of the United States and who are in indigent circumstances and, from any disability (not received in any illegal act), are unable to support themselves by manual labor, providing further that the aged wives of

such soldiers or sailors and army nurses who served with the armies of the United.States, if indigent and unable to support themselves by manual labor, shall also be entitled to admission. By both acts, county courts or the friends of the applicants were required to pay the expenses of sending them to said homes.

The conveyances contemplated were made, the title to said properties was vsted in the State, and from that day to this the Legislature has appropriated money from the public chest for the betterment of these homes and the maintenance and comfort of those who live there.

Such (in outline) are some of the constitutional, legislative and historical conditions pertinent to the consideration of the questions now in hand.

Appellant's counsel argue (1) that section 7 of article 8 of the Constitution is not in point. They argue (2) that under the rule of *ejusdem generis* these homes are not poorhouses or asylums. They say (3) that the homes in question had no existence at the time the Constitution of 1875 was adopted—*ergo,* they argue, the inmates of these home were not in the mind of the framers of the Constitution and, on lines of public policy, such inmates, citizens of Missouri, should not be disfranchised.

Of these, *seriatim.*

(1) It is apparent that section 7 is not a disfranchising section, but its force is spent on the question of residence. Under similar sections in other constitutions it has been held, in effect, that the mere fact of residence does not entitle the inmates to vote at such home, but entitles them to vote at their former homes—their real residences. [Silvey v. Lindsey, 107 N. Y. 55; Wolcott v. Holcomb, 56 N. W. (Mich.) 837; Powell v. Spackman, 65 Pac. (Idaho) 503.]

Conceding, for the purposes of the case only, that under section 7 the bare living at such home (at odd spells, maybe) would not gain a voting residence there, yet it would be a sour construction to say that an inmate

was precluded from gaining a residence provided he had the *bona fide* intention to do so, which intention might be proved by competent overt acts, *aliunde,* interpreting the situation and establishing residence in the same way a residence is proved for the purpose of election laws generally. [See Lankford v. Gebhart, 130 Mo. 621; Hope v. Flentge, 140 Mo. 390 (and cases following that in same vol.); Hall v. Schoenecke, 128 Mo. 661; State v. Snyder, 182 Mo. l. c. 516 *et seq.;* Stevens v. Larwill, 110 Mo. App. l. c. 154, *et seq.*]

In Lankford v. Gebhart, 130 Mo. l. c. 638, it was contended that the vote of one Jerry Snyder was improperly rejected, under evidence showing that Snyder had lived in Daviess county for many years, but at the date of the election was a member of the Soldiers' Home at Leavenworth, Kansas. It did not appear how long he had been a member of the home. He testified that he was a permanent member of the home, and was admitted free, but that he had no intention of changing his residence from Daviess county in this State, and that he had been at home, on furlough, for four months preceding the election. It was held that the statute made no special provision for such a case; that the legality of the vote depended upon the residence of the voter, and that it was a question of intention; that the testimony of Snyder, that he had no intention of changing his residence when he became a member of the home, might be taken as a mere conclusion of the witness, and a contrary intent might be gathered from all the circumstances of the case, and the fact that he was not permitted to leave the home without a furlough tended strongly to prove a change of residence, and, accordingly, it was further held that the trial court was justified in finding that his permanent residence was not in the State of Missouri, and hence its action in rejecting his vote was not interfered with by this court. Thus establishing that a person might acquire a legal

residence in the county in which such a "Home" was located.

Section 7 of article 8 in nowise controls the issues of this case. And while it may be conceded that the exposition of a similar section in other constitutions, made by the highest courts in such States, lends countenance to the view pressed by respondent's counsel, yet we might as well say now that we consider ourselves instructed, but not bound, by that exposition.

The Michigan, New York and Idaho cases relied upon will be seen on examination to have construed provisions of their constitutions similar to section 7 as simply prohibiting the acquiring of a residence in the county in which the asylum, poorhouse or home was located, and left the inmates to vote at their former place of residence. Those courts had not before them a provision like section 8 of article 8 of our Constitution which disfranchises such inmates. If such provision had been in those state constitutions, it is not clear to our minds that, with disfranchisement confronting a broken soldier, those courts would have worked out the same result. But whether so, or not, as said, we do not consider ourselves fettered to that construction.

In dismissing this phase of the case, it has not escaped us that the act making the Confederate Home a state institution, also declares it an eleemosynary institution. [Sec. 1, p. 26, Laws 1897.] But we lay no controlling significance on the word, "eleemosynary." It may be true that poorhouses and asylums are eleemosynary institutions, but it is a far cry from some eleemosynary institutions to poorhouses and asylums. For instance, in a broad sense public schools, public hospitals, state universities are public eleemosynary institutions. The curious may find a learned discussion upon this question, in People v. Cogswell, 113 Cal. l. c. 137; see, further, People v. Dashaway Assn., 84 Cal. 114. See, also, the *cause celebre* anent Stephen Girard's will, Vidal v. Mayor, etc., of Philadelphia, 2 Howard (U. S.)

127; Russell v. Allen, 107 U. S. 163; Whicker v. Hume, 7 H. L. Cas. 124; Robertson v. Bullions, 9 Barb. 90; Williams v. Williams, 8 N. Y. l. c. 533.

(2)   Section 8 of article 8 of the Constitution is a drastic provision, and unless the Soldiers' Home at St. James and the Confederate Home at Higginsville can by fair judicial interpretation be taken out of the purview of that section, then the contention of respondent must be allowed and the statutory exemption of their inmates from disfranchisement (sec. 6994, *supra*), must be held unconstitutional.

The contention of appellant is that general words following particular words will never be construed to include any of the class superior to that which the particular words belong, for if it had been the intention of the lawmakers to include any of such superior class, the members of such superior class would have been first mentioned and they cannot be implied.   In short, and plainly put, appellant's counsel rely upon the proposition that the "other asylum" referred to in the Constitution should be in and of the same class as a poorhouse, and we sympathize with that view.   These contentions they sustain by a wealth of cited authority. The argument proceeds upon the lofty plane that it is inconceivable that a home for old soldiers should be construed as struck at by a provision referring to poorhouses and other asylums.   But as this insistence is nearly related to the question of public policy, the one may as well be treated as merged in the other, and the same consideration cover both.

(3)   It is argued for respondent in effect that the provisos of section 6994, *supra,* are so framed as to show, by force of the doctrine of *noscitur a sociis,* that the legislative mind considered soldiers' homes as poorhouses, or other asylums—the language being, "kept at any poorhouse or other asylum at public expense, *except* the Soldier's Home at St. James and the Confederate Home at Higginsville."   Such argument is ingeni-

ous and might be allowed force in the absence of a manifest purpose writ large in the statute. A minor consideration in the legislative mind might have been the enumeration and classification of places of abode, such as prisons, poorhouses, asylums and homes. Indeed, the section in review enumerates the inmates of public prisons along with those of homes, poorhouses and asylums, but it would be an ungracious and unnecessary construction to say that the Legislature had in mind the classification of a soldiers' home with jails, prisons and poorhouses. The salient matter in the legislative mind was: who should vote and who should not vote? and if the gloss of the section is approached from that standpoint it will be seen that the Legislature intended the old soldiers should vote, i. e., it is said so.

Proceeding a step further, it will appear that section 6994 was plainly passed to carry out the Constitution. Therefore, the Constitution was in the legislative mind, and, being in the legislative mind, it would follow that in permitting the inmates of the soldiers' homes to vote, the Legislature must be held to have considered the Constitution to preclude the construction that a soldiers' home was a poorhouse, or other asylum kept at public expense, or a jail or prison. Any other view would convict the law-makers of having the Constitution before their very eyes and of passing a law in obedience thereto, while at the same time purposely, perversely, and wilfully violating its terms.

In this connection, it will be seen that the person must be kept at a poorhouse or other asylum at *public expense*. And can it be said, broadly and nobly, that old soldiers are kept at public expense? The determination of this case does not require an answer to this question; but, in leaving it, matters and memories obtrude themselves of no light significance. In the first place, a consideration was paid the State on the part of the Woman's Relief Corps of the Grand Army of the Republic under the act making the St. James Sold-

iers' Home a state institution. In the second place, a consideration was paid the State by an association owning the Confederate Home at Higginsville, under the act making that home a state institution — an institution which theretofore had been supported by said association and the Daughters of the Confederacy. Their lands and properties were taken over and accepted by the State under those contracts. The State of Missouri made the contracts through a motive of patriotic duty and along lines of sentimental beauty. The State of Missouri has shown no disposition to regret the contracts or repudiate them by the tithe of a hair, and who shall, except under the prick and goad of unquestioned constitutional mandate, dam the current of its authority or put bounds to its disposition to be imperial in its affection? Who shall weigh, as it were, with goldsmith's scales, the widow's mites that passed into the public chest and in return for which the State of Missouri plighted the public faith and by a public act solemnly agreed to maintain its soldiers, broken by misfortune in health and purse, and (what is more to the point) at the same time permit them to vote? If that thing is to be done, or can be done, it must be done in a case and upon issues where the parties to that contract are present in court and may be heard, either as litigants, or *amici curiae,* and will not be done in Hale v. Stimson, contesting a county office in Phelps county.

The question of "public expense" must, furthermore, be viewed in the light that the privilege of a home in the evening of their days, of a chimney-corner, of a hearthstone (and the right to vote) was bought and paid for with a great price by the inmates and their comrades in arms. Who at this late day, in a piping time of peace, will measure that price or care to bring it within the precision of a legal formula? Those men and their comrades in arms, stalwart then, marched and countermarched, mined and countermined, dug, starved,

Hale v. Stimson.

froze, planned, dared and fought through four years of civil war under Lee, Johnson, and Stonewall Jackson—under Grant, Sherman and Logan. Some of their comrades perished in battle, on the lone picket, on the long march, of wounds, in prisons, by burning fever, by sickness of soul, or by deadly miasma. The grave since has swallowed up many a gallant survivor, hurried under the sod by privations and exposures of war.

It is written: And as they bound him with thongs, Paul said unto the centurion that stood by, Is it lawful for you to scourge a man that is a Roman and uncondemned? When the centurion heard that, he went and told the chief captain, saying, Take heed what thou doest, for this man is a Roman. Then the chief captain came, and said unto him, Tell me, art thou a Roman? He said, Yea. And the chief captain answered, With a great sum obtained I this freedom. And Paul said, But I was free born. Whether freedom for a soldier to vote was obtained at a great price or was an incident of being free born, in the case at bar, matters little. Suffice it to say that while the elective franchise may be regulated by the State, yet in this case it has been regulated by statute and that regulation should command obedience.

Nor do we greatly care to split hairs over the question of which cause the inmates of these homes fought for. Because it was written in the book of fate that the civil war had to come. Was the Union of the States indissoluble, or was it a contract between independent States to be severed for cause? Did a citizen owe primary allegiance to his State, or to the National Government? There were ginats in those days and some of them said, Yea, and some said, Nay. Between these opposing theories, an irrepressible conflict raged. Between these antagonistic theories and the schools of statesmen advocating them, a great gulf was fixed. Compromise proved a delusion, conciliation

198 Sup—11

proved vain—reason was at an end. We can talk of it, now, kindly. It is possible, now, in perspective, to speak of it with justice. It is not necessary to blame anyone. The people were not to blame—the irreconcilable, clashing and antagonistic notions upon policies, interwoven with the very fibers of this government, were alone to blame. The wedge that split this nation in two, for a time, was forged and hammered home by powers beyond control. We had a distrust originating in ignorance of each other. There was a growth of evil seeds planted before we were born, and the question had to be settled—not by argument, not in court, nor by the ways of peace. The Missourian, or his ancestor, had come from Kentucky, Illinois or Maryland, from the Carolinas, Alabama or Georgia, from Tennessee or Indiana, from Germany, Ireland, France or Spain. He worshipped at the shrine of Calhoun, or Clay and Webster, of Breckenridge or Douglas, of Benton or Governor Jackson. When the war cloud broke there were Bates, Rollins and Phelps, Gratz Brown and Gamble, Hall and Henderson, Broadhead and Dyer to tell him that the Union of the States could not be dissolved and that Missouri was in the Union, *de facto* and *de jure*. There were Johnson and Vest, Reynolds and Jackson, Polk and Green, price and Clark to tell him his State was joined by right and ties of blood to his brethren of the South. Verily, our Missourian did not stand on the order of his going, but went under two flags, both ways —and went at once. In the smoke of war, you see him riding and fighting (in gray) with Shelby or Martin Green, or marching and fighting with Price and Cockrell, with Parsons and Marmaduke, with Bowen, Little and Gates; or you see him (in blue) marching and fighting with Blair and Philips, Critttenden and Osterhaus, with Lyon, Sigel, Guitar, Loan and Hale. When he came home from the wars, his mighty mother, the State of Missouri, with a great heart claimed him as her son —proud of his deeds, resolute to cherish his memory,

magnanimous to forget his quarrel—tender of both uniforms and mourning over dead, or war-worn and desolate, Confederate and Federal. In this condition of things, we are told that the constitutional convention of 1875 so wrote the fundamental law that if the State found any of these old soldiers at the foot of the hill of life, stranded in health and empty of pocket, it could not give them a home or a fireside except at one and the same time it took from them a freeman's precious right to vote. The power of the Constitution-makers to so write the law cannot be gainsaid, but the duty of the Constitution-makers to so write the law cannot be defended. That they did so write the fundamental law, in the light of the history of those times and of the tremendous events newly over, should not be deduced by a narrow or strained construction. And a disposition to such construction, we distinctly disavow on the high plane of public policy. In a free State, sustained by no overawing standing army, where its love must grow and its protection must rest, in the hearts of the people, patriotism should be nourished as a cardinal virtue of citizenship. The statutes and constitution of such a State must not be construed as ungrateful or unpatriotic, and it would be a pitiable incentive to patriotism to hold up before its decrepit defenders deserted by fortune, the picture of being rewarded for their sacrifices and valor, with the brand of a pauper under the roof of a poorhouse, where, in the language of the statutes regulating such institutions (R. S. 1899, sec. 9002) the superintendent thereof "shall have power to cause persons kept in such poorhouse who are able to do useful labor, to perform the same by reasonable and *humane coercion.*"

The rule of constitutional interpretation laid down by Story (Story on Constitution (5 Ed.), sec. 451), generally quoted and universally accepted as sound, is this: "In the first place, then, every word employed

in the Constitution is to be expounded in its plain, obvious and common-sense meaning, unless the context furnishes some ground to control, qualify or enlarge it. Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss.''

In the light of that rule, we do not read the Constitution of Missouri as disfranchising her sons kept at soldiers' homes. That Constitution, in force for over a quarter of a century, has not been so construed by the legal profession and, as said by SHERWOOD, J., in Venable v. Railroad, 112 Mo. l. c. 125, ''This of itself is a very pregnant circumstance, and very good evidence of what the law is.''

The learned counsel for respondent, on the matter of public policy, point to the remarks of BURROUGH, J., in Richardson v. Mellish, 2 Bing. (Com. Pl.) l. c. 252, thus: ''I, for one, protest, as my Lord has done, against arguing too strongly upon public policy; it is a very unruly horse, and when once you get astride it you never know where it will carry you. It may lead you from the sound law. It is never argued at all but when other points fail.''

Of which *dictum* it may be said, that any horse may become unruly at spells. Technicality may become a horse, which once astride and well ridden, will carry us wide of ultimate right. But no horse, straddled by any court, would carry us farther away from the path of sound law than the horse of reading into the people's

Constitution by unnecessary construction the theory that Missouri has disfranchised her veterans of the civil war, old, poor and infirm, but who are her honored guests at her own fireside on her own invitation.

Public policy is a handmaiden of sound legal exposition. It was on the lines of public policy in the great case of State v. Ambs, 20 Mo. 214, that Judge Scott sustained the legality of the Christian Sabbath. It was on the line of public policy that Gantt, J., sustained the power of this court to require the administration of the school funds of the city of St. Louis and the right of the little ones of that city to be freed of partisan caucuses, and held that the clutches of a close corporation of politicians should be lifted from those trusts. [State ex rel. v. Public Schools, 134 Mo. 296.] He said for this court in that case that ''the stream cannot rise higher than its source, and we are dealing with facts and men as they exist and are not justified in treating this matter from an Arcadian or Utopian standpoint.'' It was on the grounds of public policy that, in Long v. Long, 79 Mo. 644, Sherwood, J., agreed to the overruling of a motion for a rehearing for the reason, among others, that ''a great clamor has been made about the opinion, and I am in favor,'' said he, ''of denying the motions on that distinct ground, regardless of all other considerations. The days of any court ought to be numbered whenever it yields by the tithe of a single hair to any other considerations except those arising upon the record.'' On the ground of public policy, it was, that the same learned jurist spoke for this court in Bank v. Fricke, 75 Mo. 178, in holding that the payee of a promissory note avoids the note when, after its execution and without the consent of the payor, he makes even an immaterial alteration in its terms. And it was on the sole ground of public policy that this court, speaking through Valliant, J., held in Hobbs v. Boatright, 195 Mo. 693, that a plaintiff *in pari delicto* with a defendant may still recover in a

case where to withhold the relief would offend public morals to a greater extent than to allow the relief. It was on the grounds of public policy, too, this court held, in State ex rel. Henson v. Sheppard, 192 Mo. 497, that a circuit clerk could not act as clerk at his own trial for murder.

The judgment in this case, for the foregoing reasons, is reversed and remanded with directions to reinstate Stimson in office (if he was removed pending appeal) and to enter judgment in his behalf.

All concur.