JOSIE I. JAMES v. KANSAS CITY GAS COMPANY ET AL., Appellants.— 30 S. W. (2d) 118.

Court en Banc, July 9, 1930.

*Charles H. Mayer* and *Charles M. Miller* for appellant Gas Company.

*Chas. M. Bush* for appellant Chandelier Company.

*James M. Johnson* and *Beardsley & Beardsley* for respondent.

RAGLAND, J.—This is an action by plaintiff to recover damages for the death of her husband, caused, she alleges, by the negligence of the Bailey-Reynolds Chandelier Company and the Kansas City Gas Company. She brought her action against them jointly and recovered as against both a judgment for $10,000. Each of the defendants prosecuted a separate appeal: their appeals were consolidated here and heard as one cause. We adopt respondent's statement of the issues and facts, in part, as follows:

"On the 2d day of February, 1924, Claude O. James (plaintiff's husband) . . . was walking along the sidewalk on the east side of Grand Avenue between Ninth and Tenth Streets. Suddenly there was a terrific explosion; he was thrown into the air, the solid concrete sidewalk under him was thrown up and elevated farther into the street, as a door upon its hinges. James fell back into the open space under the sidewalk area, his body was mangled and he immediately died. [The Chandelier Company was the occupant of the building in front of which deceased met his death, the Gas Company was a public utility furnishing and distributing natural gas.] . . .

"The second amended petition of the plaintiff, on which the case was tried, alleged, among other things, the situation of a gas main running in the street in front of the building where the explosion occurred, and that there were pipes connecting with and running from said gas main into the space or room under the sidewalk and into and through the basement and other parts of the building; that through these mains and pipes natural gas, a highly explosive gas, was at all times conducted; that there were also in Grand Avenue, under the surface of the street, conduits and pipes of a sewer system carrying the sewage for that portion of the city; that the conduits and the pipes therefrom ran into and opened into the building and into the basement thereof, including the room under the sidewalk, containing highly explosive gases; that the defendants were in possession of and operating the gas mains and pipes

and sewer conduits and pipes, connections and openings, and owed to the public generally, and particularly to those who should be on the street and sidewalk, the duty to see that explosive gases did not escape from the gas mains and pipes or the sewer system, or collect in dangerous quantities in and about the premises, including the space under the sidewalk. The charge of the petition is that the defendants failed to perform this duty and negligently caused and permitted said dangerous and explosive gases to escape from the pipes, mains and sewers, and negligently permitted such gases to accumulate in the basement of the premises and the space under the sidewalk, and that the defendants well knew, or could by the exercise of reasonable care have known, of the escape and accumulation of the gases and have prevented the same, but negligently failed so to do. . . .

"The Chandelier Company did not file a general denial or specifically deny all the material allegations of the petition. It filed a special pleading in which it denied only the allegations of the petition as to its liability for the damage complained of; and then alleged that the negligence stated by the plaintiff was not in any way chargeable to it.

"The answer of the Gas Company was a general denial. . . .

"Grand Avenue runs north and south at the place in question, and is in the very heart of the business district of Kansas City; is a broad street with double street-car tracks in the center of it. About five feet from the curb line on the east side of the street ran the four-inch cast iron pipe carrying natural gas.

"The building occupied by the Bailey-Reynolds Chandelier Company was a four-story and basement building (situated on the east side of Grand Avenue, fronting west). It was wholly occupied by this company, except the north half of the first floor. There was a passenger elevator which ran from the basement through each of the three stories, and which was situated some little distance from the front, i. e., east of the front of the building. It was on the south wall. In the basement, as one stood facing the elevator, there was at the right an electric motor which operated the elevator, and the control board also was there. In front and for the protection of the motor and control board, was a heavy wire screen.

"The space under the sidewalk ran north and south the whole width of the building, about fifty feet, and was some twelve feet wide. Under the heavy concrete beam, which was across the front of the building, in this basement at this point, was a tongued-and-grooved board partition, about one inch thick. There was a door in this partition a little to the north of the screen protecting the motor and control board. One going through from the basement into the space under the sidewalk would open the door toward him,

turning it toward his right, and would pass between the door as opened and the wire screen.

"There was a concrete floor on this space under the sidewalk. Not far from the west retaining wall of this space, and near the center of it north and south, was a floor-drain leading to the sewer system.

"There had been a concrete tunnel running from the under-sidewalk space across Grand Avenue to the northwest, used to carry heating pipes in a former day. This was a concrete box some three feet wide and three feet high. The gas main in the street ran across the top of this concrete box, and was embedded, as it passed along over the box, in concrete. The entrance of the gas supply for the building came along the top of this box through the west wall of the sidewalk space.

"On the morning of the day of the explosion a negro janitor of the Chandelier Company's building came early to his work. He came in through the front door, down the stairway, which was beside the elevator shaft, into the basement. At the rear of the basement he lighted the gas jet under an iron plate and put water on to heat, and then went about his other duties.

"A little later came his assistant who operated the elevator, and came also other employees. The janitor, when the water was warm, later on, carried two buckets of water to the passenger elevator shaft above described, in the basement; rang the bell, calling down his assistant to take one of the buckets of water which had been warmed, for use in the toilets on an upper floor, and himself opened the door and passed through the doorway carrying his bucket of water into the space under the sidewalk.

"As the passenger elevator moved up and down there were created on the control board sparks about two inches long and creating an intense heat. There would be, in fact, three of these sparks or flashes at the stopping and one at the starting of the elevator at each point.

"The man operating the elevator came down and got the water and started up with it as the janitor passed through the door from the basement into the space under the sidewalk, carrying the second bucket of water, with the purpose of pouring it into the floor-drain leading to the sewer under the concrete floor.

"While he was in the south part of this space under the sidewalk, a terrific explosion occurred, burning his body very badly, lifting the sidewalk above his head, which sidewalk rested on iron cross-beams, and, as he says, lifting his body so that he easily climbed out of this space onto the street above.

"There was no conflict in the testimony that both sewer gas and natural gas are highly explosive, and that neither of them would explode unless the gas was mixed in certain proportions with air,

i. e., if the mixture contained less than five per cent of gas, or more than thirteen or fifteen per cent of gas, it would not explode; but between these points both kinds of gas were very explosive.

"There is no question but that the explosion was a gas explosion caused by gas which had accumulated in this space under the sidewalk, and which came through the door into the basement from this space when the door was opened by the janitor; and that the explosion of the gas was caused by the electric spark on the elevator control board as the elevator operator ran up the elevator car after getting the hot water left for him. There is no other explanation attempted to be made in the case. The lifting of the enormous weight of the concrete sidewalk shows that the explosion was a very terrific one. Upon the front of the building, the glass in the windows above the place of the explosion was shattered; dirt and debris filled the air, and pipes along the walls in the basement were bent to the east.

"That the explosion occurred as detailed was further evidenced by the fact that witnesses testified that on the south or retaining wall of the space under the sidewalk there were charred papers piled; and an outline of the shape of the door standing to the east and leading into the basement, and through which the line of the explosion of the gas had followed. The very heaviest part of the explosion seems to have been in the north part of this space under the sidewalk, because, as the witnesses testified, the sidewalk was more broken into pieces there than farther to the south, and witness Wattlington (the janitor), who was there at the moment, testified the heavy blast came from the northwest corner of the under-sidewalk space. This is the part of the space under the sidewalk where gas escaping from the natural gas main in the street, passing through the earth and broken rock which filled the trench about it, coming to this place above the concrete box and running through the retaining wall into the basement, would have come. Witnesses testified that there were openings from this space above the box into this under-sidewalk area. There had been an old six-inch pipe there, covered with asbestos, which had been destroyed, leaving abundant opening there through which gas could easily have come."

Plaintiff alleged in her petition: "That said explosion was an explosion of natural gas or sewer gas or both said gases. Plaintiff verily believes it was one or the other or both, she is ignorant whether it be the one or the other or both." Following the explosion, and as soon thereafter as could be done, the gas main along the east side of Grand Avenue in the vicinity of the Chandelier Company's building was uncovered, and a break in the main was discovered at a point 13½ feet south of the south line

of the building. The separation of the parts of the pipe where broken was $\frac{5}{32}$ of an inch on the one side and $\frac{1}{8}$ of an inch on the other: the separation no doubt had been increased by a contraction of the pipe after it had been uncovered, the weather being extremely cold at that time. The ends of the pipe where broken were bright with a "crystalline surface." There was evidence, however, tending to show that the flow of natural gas over the broken ends would prevent oxidization and thus cause them to remain bright indefinitely. The pipe was buried to a depth of twenty-seven inches below the surface of the street, the pavement consisting of two inches of asphalt and six of concrete. There was evidence to the effect that the customary depth at which such pipes were laid was not less than three feet, that if they were laid near the surface in such a street as Grand Avenue they were liable to be broken by the vibrations of the earth caused by the movement of heavy traffic. On the other hand the pipe as so laid had remained intact for many years, and the break could just as readily be accounted for as having resulted from vibrations caused by the terrific explosion; the falling of the great slab of concrete which had constituted the sidewalk, 35,000 pounds, over the main could itself have caused it. Under an instruction given the jury at the Gas Company's instance the question of its liability was very largely made to turn upon whether the main was broken prior to the explosion. If the break existed prior to that time the escaping gas, under all the evidence, could easily have found its way into the area-way under the sidewalk.

Evidence was offered with respect to the plumbing in the Chandelier Company's building: the soil pipes, the vents, and the traps in the line of the sewer connection. From all of which appeared that the gas which had accumulated in the area space under the sidewalk could have been sewer gas.

There was also evidence touching a certain gas fixture, called a testing fixture, which was in the area-way under the sidewalk and which belonged to and was under the control of the Chandelier Company. It was inspected after the explosion. There was a sharp conflict in the evidence as to whether any of its valves were open at that time, and whether the fixture for sometime prior to the explosion had been attached, directly or indirectly, to the service pipe which brought the gas into the building.

I. 1. The principal contention of the appellant Gas Company, and one that it strongly presses, is that its demurrer to the evidence should have been sustained by the trial court. As the predicate in part of the Gas Company's liability, the jury were required to find: "That on said second day of February, 1924, part of said main (the gas main in Grand Avenue)

was defective and in a leaking condition and gas escaping therefrom; . . . that such escaping gas . . . had leaked into said building and into the space under the said sidewalk . . . and was then and there alone or together with gas from the sewer system . . . if any . . . exploded, causing the death, etc.'' The specific issue with reference to which the demurrer challenges the evidence is whether the *gas which exploded,* causing the injury and death, was gas that had escaped from the Gas Company's main. Whether the explosion was of natural gas alone, or of natural gas in combination with sewer gas, is not involved in ruling the demurrer. This for the reason: that if the evidence is sufficient to support a finding that the gas which exploded came from the gas main, there can be no room for doubt that plaintiff made a case for the jury as against this appellant on the issues tendered by the pleadings. The concrete question, therefore, is whether the evidence as a whole offered in support of the affirmative of that issue, taken as true, together with every reasonable inference which can legitimately be drawn from it, would warrant a finding that the gas which exploded came from the gas main. A consideration of the question requires a further statement with respect to the evidence.

There were two witnesses whose testimony had a direct bearing on the question of whether the gas was sewer gas or natural gas or both: Wattlington, the janitor employed in the Chandelier Company's building, and Noelke, a mechanic who worked on the third floor but whose duties frequently took him to the basement. Both of them were called as witnesses by the plaintiff. Wattlington testified that the air in the front part of the basement, and particularly in the space under the sidewalk, was laden with a sour, gasy smell, and had been in varying degrees for a period of from six to eight weeks prior to the explosion; that at times it was so strong that it would almost take one's breath away; that there had been some such odor since 1910; that from that time on he had, under instructions from his superiors, been pouring water almost daily into the floor-drain in the area-way under the sidewalk; that beginning six or eight weeks before the explosion the odor became much worse; that during that period he told Livers, the sales-manager and who in the absence of the general manager acted as such, about the ''awful bad odor'' in the front part of the basement and in the space under the sidewalk; that Livers told him to continue pouring water into the drain; that pouring water into the drain appeared to give relief at some of the times, but at others it did not; that the odor was a stuffy smell that would take one's breath away; that it was much stronger in the morning following the closing during the night of all the openings in the basement, in-

cluding the ventilators over the space under the sidewalk; and that it had become so strong and offensive even during the day that customers who came into the building on the floors above the basement frequently commented upon it. He further testified that he did not know the odor of natural gas, and consequently could not say whether the gas he smelled and which he had attempted to describe was natural gas.

Noelke testified:

"Q. When you went into the basement did you notice anything peculiar about the atmosphere? A. Yes, I did.

"Q. What was the condition? A. The atmosphere was just hard breathing. It irritated my nostrils. The longer I was down there the harder it was to breathe.

"Q. Did you notice that each time you went down there that morning? A. Yes.

"Q. How long each time did you stay down there? A. The first time between five to seven minutes. The next time I went down for a ladder and carried it back to the freight elevator. It took seven or eight minutes. . . .

"Q. Had you been down into this basement the day before —Friday? A. Yes, sir, Friday evening.

"Q. About what time in the afternoon? A. Around four o'clock. Then about five—somewhere around five :twenty.

"Q. Did you notice this condition of the atmosphere at that time? A. Yes.

"Q. What would you say was the condition? A. Hard breathing. It had a tendency to irritate the nostrils—made me cough.

"Q. What would you say with reference to the weight of the air and the irritating condition, Friday evening as compared with Saturday morning? A. Not as bad Friday as Saturday.

"Q. Have you been about natural gas? A. Yes.

"Q. What would you say of that condition of the atmosphere as to whether or not there was natural gas in it? . . . A. As near as I can say it was gas. But not much odor—very heavy —hard breathing. And it was somewhat similar to natural gas.

. . .

"Q. Now had you noticed this odor of which you speak, or condition of the atmosphere, prior to this Friday—the day before this explosion? A. Yes. Not so much in the basement as under the sidewalk.

"Q. You had been under the sidewalk a good many times? A. Yes.

"Q. For how long a period had you been noticing it? A. Six or eight weeks before that."

A number of witnesses testified that they were familiar with the characteristics of the natural gas in use in Kansas City; that

it had very little odor; that such odor as it had was not particularly disagreeable or offensive, one saying that in quantities it gave off an odor somewhat like that of light gasoline; and that its presence in the air ordinarily made itself manifest only through the irritation of the mucus membranes of the eyes and the nasal passages. There was no countervailing evidence as to this. On the other hand it was assumed throughout by counsel and the witnesses that sewer gas was extremely obnoxious; that it smelled like decomposed matter—something dead.

From the evidence of which the foregoing is a summary a jury or other triers of fact could reasonably find: (1) that the gas which was present in the Chandelier Company's basement on the morning of February 2, 1924, and which exploded, was sewer gas; or (2) that it was natural gas; or (3) that it was a combination of the two; or (4) that it was a combination of the two in which natural gas greatly preponderated. Any one of such findings could be arrived at by an evaluation of the evidence, and need not rest on conjecture.

Assuming that a trier of the fact found that the gas which exploded was natural gas, he would have next to consider the question of how such gas came to be in the open space under the sidewalk. Immediately following the explosion the Chandelier Company and the Gas Company each employed a corps of experts and engineers to investigate and to determine, if possible, its cause. These experts and engineers exhaustively inspected and examined and tested during a period extending from days into weeks. As a result two possible sources of the escape of the gas made their appearance: the testing fixture in the area-way under the sidewalk and a broken gas main in the street. During the trial the Chandelier Company directed its principal effort to showing as far as it could that the gas came from a broken main: the Gas Company countered with evidence that the fixture furnished an available outlet.

As already pointed out there was an irreconcilable conflict in the evidence as to whether the fixture was even connected with pipes which carried gas. It would therefore be entirely within the province of the trier of fact to determine whether the fixture afforded a means for the escape of the gas. If he found that it did not afford such means, and thereby eliminated the fixture from consideration, he would have before him the facts: that the gas which had accumulated in the area-way under the sidewalk and which exploded was natural gas; that such gas would naturally and almost inevitably have found its way there from the broken gas main, if the break in the main had existed before the explosion; and that an exhaustive investigation had disclosed no other source from which the gas had come. From these facts the inference may reasonably be drawn that the break in the main had existed prior to the explosion and

that the gas had escaped through it. Such inference does not follow as a necessary conclusion from the facts and circumstances hypothesized (and of which there was substantial proof), but it is a fair and reasonable one and may therefore be legitimately drawn by the trier of fact. If for the purpose of combating such inference, it were urged that the edges of the parts of the main where the break had occurred were still bright when found, showing that no oxidization had taken place, the trier of fact could rejoin that there was evidence which he accepted as true to the effect that oxidization would not take place where natural gas was continuously flowing over the surface of the broken parts, and that the brightness of the edges at the place of the fracture was therefore without significance. If it were further urged that as there was evidence tending to show that the gas main could have been broken either by the moving traffic, or by the explosion, it is merely a matter of conjecture as to which caused the break, the answer could well be that if that were all the evidence in the case, the producing cause of the break would be conjectural, but wholly apart from such evidence and from other facts and circumstances he had found that the gas had escaped from the broken main, hence it must have been broken prior to the explosion.

We are clearly of the opinion that a finding, that the gas which exploded escaped from the gas main, can be based on the evidence in the case, and need not rest upon surmise or conjecture.

Whether the evidence in a given case is sufficient to support the finding of the jury, when taken and considered in the fashion in which it must be on demurrer, depends on whether it is sufficient to establish with reasonable certainty in the minds of persons of ordinary and average intelligence the existence of the facts on which the finding is necessarily based. Speculation as to the mental processes which may or may not have been employed by the particular jurors in making the finding can be of no aid in the solution of that question. For the reasons indicated we are of the opinion that the demurrer was well ruled.

2. Appellant Gas Company assigns error as to each of a number of rulings of the trial court in the admission of evidence. The ones most stressed will be referred to.

(1) There was one building between the Chandelier Company's building and a building known as the Federal Reserve Bank Building. On the nineteenth floor of the latter there was a cafe. A pastry cook employed there, called as a witness by the Chandelier Company, testified over the Gas Company's objection that the burners on the gas range in the cafe, for a period of from four to five weeks before the explosion, gave off a red flame, "like it had air in it," from which she drew the conclusion that the gas pressure was weak. We agree

1070

with counsel that the evidence did not prove or tend to prove any issue in the case: it was without any probative value whatever on the issue as to whether the gas main was broken before, or at the time of, the explosion. Before the reception of the testimony complained of, it had been very thoroughly demonstrated by the evidence that, owing to the devices known as the governors, the breaking of the main could not have affected the pressure, except momentarily—that was accepted as an established fact by all the parties. The error was harmless.

(2) Over the objections of the Gas Company evidence was received to the effect that the gas main was laid twenty-seven inches below the surface of the pavement, and that at one point it rested on and was partially buried in the concrete of a tunnel through which heating pipes had been extended. And further, engineers and others who had had long experiences in laying gas mains were permitted to testify that the heavy traffic passing over Grand Avenue was likely to break a main so laid: on cross-examination they gave at length the reasons upon which they based their conclusions. The objections urged to the reception of the evidence were (a) that it was not within the issues and (b) that it called for the conclusions of the witnesses, and invaded the province of the jury.

(a) No negligence was predicated in the petition on the depth at which the gas main was laid, nor on the manner in which it had been laid, but they were certainly circumstances which the jury could properly consider in determing whether the main had been broken prior to the explosion.

(b) "The jury's duty to decide that question could not be 'usurped' by a witness nor its 'province invaded.' The witness would remain a witness and the jury would remain the jury." [O'Leary v. Steel Co., 303 Mo. 363, 375, 260 S. W. 55.] If the jurors were as capable as the experts of drawing the proper inferences from the facts, they would very naturally disregard opinions that did not coincide with their own. The error, if any, in receiving the opinions of the experts was harmless.

(3) A chemist called by the Chandelier Company as a witness, during his examination by that defendant's counsel, testified with reference to an experiment he had made. The testimony given in that connection and the objection made to its reception were as follows:

"Q. Did you after this explosion conduct a test in your laboratory of a broken gas pipe with gas surrounding it and passing through it? A. I did.

"Q. How long did that test continue? A. Something over a year.

"Q. Did the pipe remain bright during that time?

"Mr. Miller: Just a minute. I object unless the conditions of the test are shown, and it is supposed to be under the same conditions that existed around this pipe at the time of this accident.

"Q. (By Mr. Bush): Just state to the jury what test you conducted and how you conducted it. A. Some broken cast iron pipe was placed in some jars with water, that is, say some moisture would get on to the break in the same way and the wet soil would be adjacent to the break, in the same way that the soil or mixture, rock and soil, taken from the cut in front of the Bailey-Reynolds' Building was next to the broken surface, and City Gas delivered to our premises at Seventh and Baltimore Avenue was allowed to flow over those breaks for a period of something over a year, and in no case was there any rusting.

"Mr. Miller: Just a minute. Now, if Your Honor please, we object to that because the conditions are not shown to be like what surrounded this pipe at the time of the explosion, and unless the tests are under identical conditions we submit it is incompetent, irrelevant and immaterial to any issue in this case. As I understand, matters of tests have to be—before tests are competent they have to be under exactly the same conditions.

"The Court: Objection overruled.

"A. The gas was allowed to flow over freshly broken surfaces in jars, and after a period of more than a year in no case was there any rusting or oxidizing on the broken surfaces."

In order that an experiment shall possess sufficient probative value to warrant the admission of evidence thereof, it is necessary that the circumstances under which the experiment was made should have been similar to those prevailing at the time of the occurrence involved in the controversy. But it is not necessary that the conditions should have been exactly identical: it is sufficient if the *causal* conditions and circumstances were substantially reproduced. [Holzemer v. St. Railway Co., 261 Mo. 379, 169 S. W. 102; Riggs v. St. Ry. Co., 216 Mo. 304, 115 S. W. 969.] According to the witness's testimony the causal conditions were substantially reproduced at the experiment. The objection was therefore properly overruled.

(4) After plaintiff had introduced sufficient evidence to make a prima-facie case, she apparently became a mere spectator at a battle fiercely waged by and between the defendants: defendant Gas Company attempting to escape the responsibility for the explosion, by shouldering it all on the Chandelier Company, and the latter making a determined effort to prevent any such escape. While the Gas Company's counsel was examining its witness, the chief of the Kansas City Fire Department, he elicited a number of specific instances in which there had been

violent explosions of sewer gas. Counsel for the Chandelier Company protested in vain: the evidence was admitted notwithstanding. When it came his time to cross-examine the witness, he prefaced this part of his cross-examination as follows: "Speaking about explosions in sewers, you have seen several gas explosions in buildings around here, haven't you?" Then followed a series of questions which developed that many alleged explosions of natural gas had occurred in Kansas City. The Gas Company's counsel objected without avail, on the ground that the evidence called for was "incompetent and immaterial to any issue in the case." He now insists that the evidence was calculated to greatly prejudice his client in the minds of the jury. It was admitted by the trial court as tending to show "the explosive properties of natural gas." But assuming that the evidence was incompetent, the appellant Gas Company is not in a position to complain: it had, in a sense, invited the introduction of that particular character of evidence, and had been the first to offend in that respect.

(5) The other rulings made in connection with the admission of evidence of which appellant complains, considered from the standpoint of reversible error, are wholly without merit.

(6) Appellant Gas Company also complains of the giving of plaintiff's Instruction No. 2, on the ground that it "submitted to the jury an alleged issue of a defective main due to a 'bubble' in the pipe . . . which had nothing to do with the cause of the breaking of the pipe." There is no mention of a "bubble" in the instruction: the fact hypothesized was: "that part of said main was defective and in a leaking condition and gas escaping therefrom." Construed in connection with the evidence the defective condition which permitted gas to escape, and which the jury was required to find, was plainly the break in the main. The instruction therefore is not subject to the criticism leveled against it.

II. Appellant Chandelier Company has assigned many errors—on the admission and exclusion of evidence and the giving and refusal of instructions. These need not be considered for reasons that will presently appear. The petition, among other things, alleged: "That along side the building aforesaid, and to the west of the same was at all times herein mentioned, a stone or concrete sidewalk along which the public passed back and forth. The basement which was under the said building extended out under this said sidewalk so that there was an opening or room under said sidewalk at that place. That there are and were at all times herein mentioned in Grand Avenue in front of

said premises and running between said 9th and 10th Streets, under the surface of the street, gas mains through which natural gas was being conducted for public and private use and there are and were during all said times, pipes connecting with and running from said gas mains into the said space or room under the said sidewalk and into and through the basement and other parts of said building through all of which mains and pipes said natural gas, a highly explosive gas was at all said times being conducted. There were also at all said times in said Grand Avenue under the said surface, the conduits and pipes of a sewer system carrying the sewage for that portion of the city; conduits and pipes therefrom, and connecting therewith, running into and opening into said building and the basement thereof, including said room or opening under said sidewalk and containing highly explosive gases. That *defendants* were in possession of and operating said gas mains and pipes and said sewer conduits, pipes, connections and openings and owed to the public generally and particularly to those who should be on the street and sidewalk in and about said premises, the duty to see that explosive gases did not escape from said gas mains and pipes or said sewer system or collect in dangerous quantities in and about said premises, including the space or room under said sidewalk.

"That *defendants* negligently failed to perform this duty and negligently caused and permitted said dangerously explosive gases to escape from said gas mains and pipes and sewer, and negligently permitted such gases to accumulate in the basement of said premises and in said space or room under said sidewalk.

"*Defendants* well knew or could, with the exercise of reasonable care, have known of the escape and accumulation of said gases and prevented the same, but negligently failed so to do."

The answer of the Chandelier Company was as follows:

"Comes now the defendant, The Bailey-Reynolds Chandelier Company, and for its separate amended answer to plaintiff's second

amended petition, denies each and every allegation as to the liability of this defendant for the damage complained of in said second amended petition, and states that the alleged negligence stated by plaintiff was not in any way chargeable to this defendant."

It will be noted that the answer was neither a general nor a specific denial; its qualified denial of the allegations of the petition was no denial at all. [State ex rel. v. Seibel, 295 Mo. 607, 624, 246 S. W. 288; Dezell v. Fidelity & Casualty Co., 176 Mo. 253, 279, 75 S. W. 1102; Long v. Long, 79 Mo. 644, 649.] In the first place, the trial court was not bound, nor is this court bound, to analyze the petition and then isolate the allegations which it may be sup-

posed defendant considered "allegation(s) as to the liability of this defendant for the damage complained of." And in the second place, both the language just noted and the remainder of the answer connote mere conclusions of law, and in so pleading conclusions of law the answer wholly fails to traverse the allegations of fact contained in the petition. [Mallinckrodt Chemical Works v. Nemnich, 169 Mo. 388, 397, 69 S. W. 356; Montgomery v. Clem, 221 Mo. App. 486, 490, 282 S. W. 1051, and cases there cited.] The material allegations of the petition were therefore not denied, and being not denied stood confessed. [Sec. 1256, R. S. 1919.] Consequently, the plaintiff was entitled to judgment on the pleadings, as against the Chandelier Company.

Appellant insists, however, that as respondent did not raise any question as to the sufficiency of its answer on the trial, but treated the answer as a general denial, she is estopped to attack the answer on appeal. Appellant overlooks the fact that the two defendants were charged in the petition with having jointly committed all the acts of negligence upon which liability was predicated. The defendant Gas Company's answer was unequivocally a general denial; it was therefore necessary for plaintiff to offer proof and proceed in all respects on the trial as though both defendants had tendered the general denial. There is another fact worthy of note in this connection. Not only was the Chandelier Company's answer ambiguous, but its attitude throughout the trial was equivocal. One present at the trial who did not know the relation of the parties to each other on the record must have concluded that the Chandelier Company was a co-plaintiff, so exclusively did it direct its efforts to a showing of liability on the part of the Gas Company. One gets the impression from the record that the Chandelier Company was not seriously denying its own liability. If there is any estoppel growing out of the alleged shifting of positions it operates more strongly against the appellant Chandelier Company than the respondent.

But regardless of whether the Chandelier Company did in fact concede its liability, the evidence is ample to justify the verdict of the jury against it. There was evidence to the effect that for six or eight weeks prior to the explosion gas had been coming into and accumulating in its basement in such quantities that an explosion was likely to occur at any time. There was substantial evidence from which the jury could find that the Chandelier Company knew, or ought to have known of the existence of this condition on its premises, in ample time to have remedied it and thereby avoided the killing of plaintiff's husband, and in the exercise of ordinary care would have done so.

It follows from what has been said that the errors, if any, committed in the reception and exclusion of evidence and in the

giving and refusal of instructions did not materially affect the rights of the appellant Chandelier Company.

The judgment of the circuit court as against both appellants is affirmed.    All concur.