LEONA J. MORAN, Administratrix of the Estate of JOE E. MORAN, Plaintiff, v. ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Appellant.—48 S. W. (2d) 881.

Court en Banc, April 12, 1932.*

---

*NOTE: Opinion filed at October Term, 1931, March 15, 1932; motion for rehearing filed; motion overruled at April Term, April 12, 1932.

280

*Cyrus Crane, S. J. Jones, Geo. J. Mersereau* and *T. L. Montgomery* for appellant.

John C. Mills, M. D. Campbell and John M. Campbell for respondent.

FRANK, J.—Action under the Federal Employers' Liability Act to recover damages for the alleged wrongful death of plaintiff's intestate and husband, Joe E. Moran, an assistant signal maintenance man in the employ of defendant. He was struck by a through passenger train at Rutledge, Missouri, on December 14, 1926, while endeavoring to remove a service motor car from the track and out of the path of the approaching train. Plaintiff recovered judgment in the sum of $30,000 and defendant has appealed.

It is admitted that both deceased and appellant were at the time of the accident engaged in interstate commerce. The case was, therefore, properly brought under the Federal Employers' Liability Act, and being brought under a Federal act, it is governed by applicable Federal decisions.

The petition states a case under the humanitarian or last chance doctrine. The answer contains a general denial and pleas of contributory negligence and assumption of risk.

The refusal of defendant's demurrer to the evidence is assigned as error. In support of this contention it is claimed that no case was made for the jury under the last chance rule as applied in the Federal Courts. ▮ It is asserted that the humanity rule enforced in the Federal Courts is not the so-called humanitarian doctrine which prevails in Missouri, but the last clear chance doctrine; that under the last chance doctrine a negligent defendant will not be held liable to a negligent plaintiff except where the defendant, "aware of the plaintiff's peril or unaware of it only through carelessness, had in fact a later opportunity than the plaintiff to avert an accident." [K. C. So. Ry. Co. v. Ellzey, 275 U. S. 236, 241, 72 L. Ed. 259, 48 Sup. Ct. 80.] In other words, if the plaintiff's negligence continues as an active factor up to the happening of the accident he cannot recover on the last chance theory. [Wheelock v. Clay (8th C. C. A.), 13 Fed. (2d) 972, 973.] Measuring the case by this rule, appellant contends that Moran had the later opportunity to avert the accident, in that he knew the train was coming and could have at any moment stepped out of harm's way, but having negligently failed to do so, his active continuing negligence down to the time of the injury defeats respondent's right to recover damages for his death.

▮ We do not agree to appellant's contention. In the first place, this case was brought under the Federal Employers' Liability Act (45 U. S. C. A., Chap. 2, secs. 51, 53). This act provides that a carrier shall be liable in damages for the injury or death of its employee "resulting in whole or in part" from the negligence of its officers, agents and servants; and that the contributory negligence of the employee "shall not bar a recovery" but merely operate in diminution of damages.

This statute does not make the liability of the carrier contingent upon its negligence occurring later in point of time than the negligence of the plaintiff. The statute provides, without qualification, that the carrier is liable if the injury or death of its employee *results in part* from its negligence. We interpret the statute to mean that the negligence of a plaintiff however late in point of time and however directly connected with the injury, does not defeat a cause of action under the statute—if the defendant's negligence remains a proximate contributing cause.

■ The word negligence as used in this statute has a broad meaning. The statute does not attempt to define it. In a recent case the United State Supreme Court, speaking of the Act, said, ''It is to be construed liberally to fulfill the purposes for which it was enacted and to that end the word (negligence) may be read to include all the meanings given to it by courts and within the word as ordinarily used.'' [Jamison v. Encarnacion, 281 U. S. 635, 640, 74 L. Ed. 1082, 50 Sup. Ct. 440.] Without doubt it comprehends any negligence of the defendant causing or proximately contributing to the injury, whether antecedent or subsequent to the negligence of the plaintiff. The cases cited by appellant in support of its contention that the last chance doctrine applies to this case, are not cases under the Federal Employers' Liability Act and for that reason they are not of controlling influence here. But we need not and do not rest our decision on the statute alone. If we are wrong in our conclusion as to what the statute means, and if the last clear chance doctrine, as contended for by defendant, applies to this case, we would still hold that a case was made for the jury under that doctrine. The facts in the case would not justify us in holding as a matter of law that deceased Moran was guilty of such negligence as precludes a recovery in this case, either under the statute or under the last chance doctrine. That question was one of fact to be determined by the jury.

For more than four years prior to Moran's death, he was in the employ of defendant as a workman engaged in maintaining its signal system. At the time of his death he was working under the direction of his boss, Ora Greer, to whom defendant furnished a motor car for use in going from place to place over defendant's tracks in the performance of their duties.

On the day in question Greer and Moran left defendant's station at Baring and proceeded eastward upon the motor car to defendant's station at Rutledge. It was Greer's custom to inquire of station agents as to the whereabouts of trains. Before leaving Baring, Greer learned that train No. 22 was late. He testified that he so informed Moran. On arriving at Rutledge, Greer stopped the motor car in

front of the station, left Moran with it, and went into the station and inquired as to the whereabout of train No. 22. While he was in the station, train No. 22 whistled at the whistling post one-half mile west of the station. Moran at once and hurriedly started to push the motor car eastward to a switch for the purpose of removing it from the track. The motor car weighed eight hundred pounds and it was a heavy job for one man to lift it from the track. With his back to the on-coming train, he pushed the motor car about two hundred feet to the switch track. He almost succeeded in getting the car and himself in the clear when the engine struck him and inflicted the injuries which caused his death.

Other pertinent facts will be stated in course of the opinion.

One of the questions raised by the demurrer is whether or not the engine crew, by the exercise of ordinary care, could have averted the accident by stopping or slowing the train after they actually saw Moran in a position of peril. Both the engineer and fireman testified that they saw Moran as the engine rounded the curve onto the straight track and that point is shown by evidence of respondent to be 700 feet from the place where Moran was struck. The fireman testified that the instant the engine rounded the curve onto the straight track, he saw Moran endeavoring to get the car in the clear; that he knew unless something was done to stop the train, there was great danger of Moran's being killed. These facts tend to show that the engineer saw Moran in a position of peril when the engine was 700 feet from him.

The next question is whether or not the engineer by exercising ordinary care, could have stopped the train within the 700 feet, or slackened the speed thereof and thus avoided striking Moran. The train was traveling from forty to forty-five miles per hour. The day was clear and the track was dry. Plaintiff offered as a witness, an engineer of thirty-two years experience. The facts testified to by this witness and by appellant's engineer and fireman as to the condition of the track and the character and equipment of the engine and train, sufficiently qualified plaintiff's witness. He testified that a train consisting of eleven to fourteen coaches approaching Rutledge from the southwest, the weather clear and the track dry, could have been stopped by use of the emergency brake within six hundred feet. This witness had looked over the location and conditions of the track at Rutledge, and observed one of defendant's 3400 type engines. The record discloses that while he had no personal knowledge of the character and equipment of the engine and train, he gave his testimony on the assumption that the train was equipped with a 3400 type engine and Westinghouse air brakes, and it appears from the testimony of defendant's engineer and fireman that the train in question was so equipped and the brakes were in good working order.

Appellant's engineer later testified that the train which struck Moran consisted of eight instead of fourteen cars, and that an eight-car train requires 100 feet more than a fourteen-car train in which to make an emergency stop. If, as respondent's witness testified, a fourteen-car train could have made an emergency stop in 600 feet, by adding the 100 feet more which defendant's engineer says an eight-car train would require in making an emergency stop, we have evidence that the eight-car train which struck and killed Moran could have made an emergency stop in 700 feet. But it would not have been necessary to stop the train in order to avoid striking Moran. A perceptible slackening of the speed would have saved his life. He was pushing the motor car onto the switch track and lacked only eight inches of being in the clear at the time the engine struck him. ■ The evidence of plaintiff is that the speed of the train was not slackened before it struck Moran, and that it ran a quarter of a mile after striking him before it was brought to a stop. Defendant's evidence is that the train ran one thousand to twelve hundred feet after striking him. Whether or not the engineer by exercising ordinary care, could have avoided the accident by stopping the train or checking the speed thereof, was, under the evidence, a jury question.

In further support of its demurrer to the evidence, appellant contends that Moran had the later opportunity of preventing the collision because he knew the train was coming and could have saved himself by stepping off the track to a place of safety, but negligently failed to do so. From this contention it is argued that his active continuing negligence in remaining on the track and attempting to remove the motor car therefrom prevents a recovery in this case.

■ Conceding that the last clear chance doctrine, as contended for by appellant, applies to this case, we would not be justified in holding as a matter of law that the acts of Moran in the emergency confronting him amounted to such negligence as precludes a recovery in this case. There was evidence that it was his duty to remove the motor car from the track. He was hurriedly pushing the car to the switch track in order to perform that duty. His back was to the on-coming train. No alarm signals were given and the train was making little noise. There is no evidence that he knew or appreciated that the speed of the train had not been slackened or that the train was dangerously near him. He had no time for deliberation. He was acting in an emergency. His act in remaining at his post of duty and endeavoring to remove the motor car from the track, presumably to protect the lives of the train crew and passengers by avoiding a wreck of the train, should be regarded as an act of heroism rather than an act of negligence, unless his conduct under the circumstances

would, in the judgment of men of ordinary prudence, amount to an utter and reckless disregard for his own safety. Error in judgment at such a time would not convict him of recklessness. ■ [Schroeder v. C. & A. Ry. Co., 108 Mo. 322, 331, 18 S. W. 1094; Pittsburg C. & C. Co. v. Lynch, 69 Ohio State 123; International & G. N. R. Co. v. McVey, 81 S. W. 991; Central Ry. Co. v. Crosby, 74 Ga. 737; Cottrill v. Chicago M. & St. P. Co., 47 Wis. 634; Pa. Ry. Co. v. Roney, 89 Ind. 453; Harris v. Township of Clinton, 64 Mich. 447; Chesapeake & O. R. Co. v. Langs, Admx., 135 Ky. 76; Jones v. McKay T. C. Co., 137 La. 121; Houston & T. C. R. Co. v. Goodman, 85 S. W. 492; Gulf C. & S. F. Ry. Co. v. Brooks, 132 S. W. 95; Omaha & R. V. Ry. Co. v. Krayenbuhl, 48 Neb. 553.]

A case strikingly similar to the one at bar was before the Circuit Court of Appeals, Ninth Circuit, in Great Northern Ry. Co. v. Harman, 217 Fed. 959, L. R. A. 1915C, 843. In that case the plaintiff and his companion were pushing a push car on the track. As they pushed the car around a curve, plaintiff saw a train 400 or 500 feet ahead, approaching at a speed variously estimated by witnesses at from twenty to forty-five miles per hour. While plaintiff was attempting to remove the push car from the track, and when he had almost succeeded in doing so, the train struck the push car, driving it against the plaintiff and seriously injuring him. That case was tried on the theory that the defendant had "the last clear chance" to avoid injuring the plaintiff and negligently failed to do so. What the court said in disposing of that case is so thoroughly in accord with our views as to what should be said in this case that we quote therefrom the following:

"It is true that he was a trespasser, but notwithstanding that fact the defendant's employees in charge of the operation of the train owed him the duty of ordinary care as soon as his position of danger was actually seen and appreciated. A cause of action arose in his favor, if the defendant actually knew of his peril and thereafter failed to exercise ordinary care to avoid injuring him; and the plaintiff's contributory negligence cannot defeat the action, if it can be shown that the defendant might by the exercise of reasonable care and prudence have avoided the consequences of that negligence. (Citing numerous Federal cases.)

"But it is urged that the court erred in refusing to instruct the jury that if, after seeing the approaching train, the plaintiff remained on the track in an endeavor to remove the push car, his carelessness in so doing continued as a cause of his injury, and that, therefore, he cannot recover, notwithstanding that the defendant in the exercise of reasonable care might have stopped the train in time to avoid striking him. The cases which are cited to sustain this

proposition do not involve the doctrine of the last clear chance. We do not find that what the plaintiff did under the circumstances shows such obvious disregard of duty and safety as amounts to misconduct which the courts should declare to be negligence as a matter of law. The question was clearly one for the jury. (Citing authorities.)

"The defendant, in view of the obstruction on the track and the plaintiff's peril, was in duty bound to stop the train if possible. The situation was not like that in which an engineer of a train sees a man walking on the track several hundred feet ahead of him, and has the right to assume that the man will get out of the way. It was a situation in which the engineer discovered men on the track with a push car, which if it were not removed, and the train were not stopped, might occasion a disastrous collision. He saw that the two men were in the act of removing the push car, yet, according to the plaintiff's testimony, the speed of the train had not been perceptibly diminished when the collision occurred. The plaintiff had knowledge and experience in the handling of trains, as was shown by the evidence, and on seeing the approaching train may well have assumed that it would be brought to a stop before reaching the place where he was. He was acting in an emergency, with but a moment for deliberation, and what he did was presumably for the purpose of avoiding injury to the passengers on the train. His conduct in so doing should not be held to absolve the defendant from the duty of reasonable care under the last clear chance doctrine, and it should not be held as matter of law that it was the duty of the plaintiff, on seeing the approaching train, to betake himself to a place of safety and abandon the car on the track, with all the possible resulting consequences. In 29 Cyc. 523, it is said:

" 'The law has so high a regard for human life that it will not impute negligence to an effort to preserve it, and one who attempts to rescue another from imminent danger is not guilty of contributory negligence, although he thereby imperils his own life, whether he is aware of the danger or not, where such attempt is made in good faith, in the belief that he could save the life of the person in danger and avoid injury himself, unless the attempt be made under circumstances amounting to rashness or recklessness in the judgment of a man of ordinary prudence. Error in judgment at such times will not defeat recovery.' "

The above case has been cited and followed in subsequent Federal decisions. [Brien v. Detroit U. Ry., 247 Fed. 693, 698; Vigil v. A. T. & S. F. Ry. Co. (8 Ct. C. A.), 261 Fed. 313, 316.]

It is further urged in support of the demurrer to the evidence that Moran's own negligence was the sole cause of his injury.

We have thus far refused to hold that Moran's act in remaining on the track and attempting to remove the car therefrom amounted to negligence as a matter of law. The other evidence to which appellant points in support of this contention is the testimony of its engineer. He testified that when he first saw Moran he was between the passing track and the south rail of the main track pushing the hand car ahead of him; that he was in the clear of the train and if he had remained there he would not have been struck; that when the train got within fifty feet of him he stepped over the north rail into the path of the on-coming train. The trouble with appellant's contention is that we are not at liberty to decide this case solely on the testimony of its engineer. Respondent's witnesses testified that Moran was between the rails and in the path of the locomotive from the beginning. The conflict in the evidence as to Moran's position raised an issue of fact for the jury. This controverted issue was fairly submitted to the jury by defendant's instruction number 9. The jury's verdict put the question at rest.

Appellant's final insistence in support of its demurrer to the evidence is that the evidence shows as a matter of law that Moran assumed the risk.

█ Under the Federal rule, Moran assumed the risks and dangers ordinarily incident to his employment, and also the risks caused by his employer's negligence which were fully known to and appreciated by him, or so plainty observable that they should be presumed to be known to him.

We cannot say as a matter of law that Moran knew and appreciated that the engineer might negligently fail to stop the train or slacken its speed after seeing the motor car on the track which threatened his own life and the lives of the other members of the crew, and passengers, and after seeing that Moran was attempting to remove the obstruction from the track. Neither can we say as a matter of law that the near and dangerous approach of the train was so open and obvious that Moran knew and appreciated or should have known and appreciated the danger of being struck by the train if he did not leave his post of duty and abandon the motor car on the track, especially so in view of the fact that he was acting in an emergency without time for deliberation, and in view of the further fact that the train approached him without giving any alarm signals and making but little noise. There was evidence that Moran lacked only eight inches of being in the clear when the engine struck him. Evidence that he came so near getting in the clear tends to show that he had reasonable grounds for believing that he would have time to remove the motor car from the track, and that he did not appreciate the near and dangerous approach of the train. [C. &

Q. R. Co. v. De Atley, 241 U. S. 310; Railroad Co. v. Doktor, 290 Fed. 760.] Under the circumstances shown we cannot judicially say that Moran did not act as an ordinarily prudent person would have acted under the same circumstances, and therefore decline to hold, as a matter of law, that he assumed the risk.

■ It is next contended that the court erred in admitting the testimony of witnesses Forquer, Easley and Sleeth, as to the distance in which train No. 22 made station or service stops at the towns of LaPlata and Hurdland.

Some time after Moran was killed these witnesses observed train No. 22 (the train which struck Moran) make a station or service stop at the town of La Plata. They also observed this same train make a station or service stop at Hurdland on two different occasions. On the occasions these observations were made, the day was clear and the track was dry, as it was at Rutledge when Moran was killed. It was shown that the track was more up-grade at Rutledge than it was at either Hurdland or La Plata, which was conducive to a quicker stop of the train at Rutledge than at either of the other places. Appellant's engineer testified that the type of equipment, engines, cars, brakes, etc., had been the same on train No. 22 at all times since the accident. On the occasions these witnesses observed this train make station or service stops at La Plata and at Hurdland, the speed of the train was forty to forty-five miles per hour, the same as it was on the day Moran was killed at Rutledge. They testified they saw the brakes go on; that the train observed at La Plata had eleven coaches and stopped within 600 feet after the brakes were applied; that the train observed at Hurdland on two different occasions had fourteen coaches and stopped within 600 to 700 feet after the brakes were applied. Defendant's engineer testified that the train which struck and killed Moran had eight coaches. He also testified that an eight-car train requires 100 feet more space than a fourteen-car train in which to make an emergency stop.

Objection was made to this testimony on the ground (1) that it was too remote, and (2) because it had not been shown that conditions or the track were the same.

We do not see the basis for this contention. The condition and grade of the track at Rutledge, the place where the accident occurred, was shown to be such that a quicker stop could be made at Rutledge than at either La Plata or Hurdland where the observations were made. The train observed by the witnesses at La Plata and Hurdland was the same train (No. 22) which struck Moran at Rutledge and was traveling at the same rate of speed. According to the evidence of appellant's engineer the character of equipment, engines,

cars, brakes, etc., of the train observed by these witnesses was exactly the same as the equipment of the train which struck Moran except as to the number of coaches, and the difference in the number of coaches was accounted for by the testimony of appellant's engineer, as we shall hereafter point out. Without doubt, the conditions were shown to be sufficiently similar to render the testimony as to the observations made by these witnesses admissible.

What does the testimony of these witnesses tend to prove? They observed a fourteen-car train make a station or service stop at Hurdland. They testified they saw the brakes go on, and the train stopped within 600 to 700 feet after the brakes were applied. While testimony that a fourteen-car train made a service stop within 600 to 700 feet does not tend to show the exact distance in which a fourteen-car train could make an emergency stop, but it does tend to show that it could make an emergency stop in less than 600 to 700 feet, because the evidence is that an emergency stop can be made in less distance than a service stop. Now, if a fourteen-car train can make an emergency stop in less than 600 to 700 feet, add to that the 100 feet more which appellant's engineer says an eight-car train would require in making an emergency stop, we have the distance in which an eight-car train could make an emergency stop, which is less than 700 to 800 feet. Clearly this testimony was competent because it tended to prove the distance in which the eight-car train which struck and killed Moran could have made an emergency stop.

Appellant urges other alleged errors in the admission of evidence. We have given them due consideration and find they present no substantial question requiring discussion.

It is next contended that the court erred in giving plaintiff's instruction number one.

 This instruction told the jury if they found certain facts hypothesized in the instruction and further found "that the said Joe E. Moran, *did not by reason of his employment assume the risk of being so struck as defined in other instructions*, then you will find a verdict for plaintiff, although you may further find and believe from the evidence that said Joe E. Moran was guilty of negligence in remaining upon or near said track and said negligence directly contributed to his death."

The first objection to this instruction is that the italicized portion of the instruction which refers the jury to other instructions for a definition of assumption of risk is erroneous because there were no "other instructions" given for plaintiff defining assumption of risk. A sufficient answer to this contention is that defendant's instructions five and seven fully and fairly defined assumption of risk and

directed the jury to find for defendant in event they found that Moran assumed the risk as defined in said instructions. All instructions given in the case must be read and considered together as the law of the case. [Burdoin v. Town of Trenton, 116 Mo. 358, 371, 372, 22 S. W. 728.] Appellant recognized this rule in its instruction number one which informed the jury that "Each and all of the instructions are the law for your guidance although read to you by opposing attorneys and all of the instructions are to be considered by you in making up your verdict."

The next complaint against the instruction is that it did not direct the jury as to the measure of damages, or inform them how to arrive at the amount which should be deducted from the whole amount found, on account of plaintiff's contributory negligence.

█ This instruction does not purport to give direction as to the measure of damages or the amount of the recovery. It simply hypothesized the facts necessary to be found in order to authorize a finding for plaintiff and directed a finding for plaintiff in event such facts were found. One issue for the jury to determine was whether or not the defendant was liable. Another issue was the amount of that liability. While it would have been proper to submit both issues by the instruction, it was not necessary to do so. The method by which the amount of the liability should be determined is not an element of the liability itself, and for that reason it was not indispensable that it be included in the instruction which submitted the question of liability. The instruction did not purport to submit any issue except the question of defendant's liability, and as it properly submitted that question, it is not erroneous. [Shannon v. Light & Power Company, 315 Mo. 1136, 1152, 1153, 287 S. W. 1031.]

█ Neither party requested an instruction on the measure of damages and no instruction was given on that subject. Appellant contends that the failure to give such an instruction was error.

This contention cannot be upheld for two reasons. In the first place, this question was not preserved for review. No objection was made either at the time the case was submitted to the jury or in the motion for new trial that the court failed to give an instruction on the measure of damages. The only complaint touching this subject in the motion for new trial is that plaintiff's given instruction number one (which submitted the question of defendant's liability only) was erroneous because it did not direct the jury as to the measure of damages. We have heretofore ruled this complaint against appellant. The complaint now made that the court should have by another instruction directed the jury as to the measure of damages, was not made in the court below and is, therefore, not an open question here. But if this complaint was open for review, it would not

294

avail appellant. This is a civil action and failure to give an instruction, in the absence of a request so to do, is not misdirection but mere nondirection, which is not error. Courts are not required in civil cases to instruct on all questions, whether suggested or not. [Wheeler v. Bowles, 163 Mo. 398, 409, 63 S. W. 675; Powell v. Railroad, 255 Mo. 420, 453-9, 164 S. W. 628; Shannon v. Light & Power Co., 315 Mo. 1136, 1152, 1153, 287 S. W. 1031.] If appellant desired that the jury be directed as to the measure of damages, it should have requested an appropriate instruction on that subject. Not having done so, it is not in a position to complain of the court's mere nondirection. [Shannon v. Light and Power Co., supra.]

Appellant cites in support of its contention on this question, Norfolk & Western Ry. Co. v. Earnest, 229 U. S. 114; Grand Trunk Ry. Co. v. Lindsay, 233 U. S. 42; Seaboard Air Line v. Tilghman, 237 U. S. 499; Gulf, C. & S. F. Ry. Co., v. Moser, 275 U. S. 133; Chesapeake & Ohio Railroad Co. v. Kelly, Admrx., 241 U. S. 485; Chesapeake & Ohio Railroad Co. v. Gainey, Admrx., 241 U. S. 494. In these cases the question of nondirection was not involved. In each of these cases an instruction was given, and the question decided was whether or not the instruction as given amounted to misdirection.

Neither party requested an instruction on diminuition of damages because of contributory negligence, if any, of the deceased. Failure to give such an instruction in the absence of a request therefor, was mere nondirection which is not error. It devolved on the defendant to ask such an instruction if one was desired. [Carpenter v. K. C. So. Ry. Co., 189 Mo. App. 164, 168, 175 S. W. 234, 235; Delano v. Roberts (Mo. App.), 182 S. W. 771, 773; Harris v. St. L. & S. F. Rd. Co. (Mo. App.), 200 S. W. 111, 113; Hinton v. C. G. W. Rd. Co. (Mo. App.), 206 S. W. 396, 398; Lafever v. Payne (Mo. App.), 218 S. W. 970.]

It is next urged that the verdict is excessive.

 Contention is made that the court erred in not directing the jury as to the manner in which they should arrive at the proper measure and amount of damages. Gulf, C. & S. F. Ry. Co. v. Moser, 275 U. S. 133; Chesapeake & Ohio Ry. Co. v. Kelly, Admrx., 241 U. S. 485, are cited in support of this contention. These cases hold that "in computing the damages recoverable for the deprivation of future benefits, the principle of limiting the recovery to compensation requires that adequate allowance be made, according to the circumstances, for the earning power of money; in short, that when future payments or other pecuniary benefits are to be anticipated, the verdict should be made upon the basis of their present value only."

These cases announce the correct measure of damages, and defendant had the right to request that the jury be so instructed. But not having requested such an instruction, for reasons heretofore stated, it is not in a position to complain that the jury was not so instructed. [Louisville & Nashville Railroad Co. v. Holloway, Admrx., 246 U. S. 525.]

Moran was killed on December 14, 1926. He left surviving him a wife then twenty-seven years of age and a daughter twenty-two months of age. He was thirty-one years of age and in perfect health. His life expectancy was thirty-five years. During his life expectancy, without increase in wages or overtime, he would have earned more than $54,000. His wife and child were dependent on him for support.

Contributions from Moran's income which the wife and child have lost by reason of his death, is not the sole measure of recovery. While there can be no recovery in this case for loss of companionship or mental anguish suffered because of the death of the husband and father, the value of the services which he probably would have rendered in training and educating his daughter, comes within the perview of the loss for which plaintiff is entitled to recover. It is somewhat difficult to measure the value of such services by material standards.

Defendant submitted its case to the jury by fourteen instructions which the court gave at its request. No instruction on the measure of damages was requested. By failing to request such an instruction, defendant left the amount of recovery to the judgment of the jury. In this situation the estimate of the jury should not be disturbed unless it is plaintly excessive, which we do not think it is

The judgment should be affirmed. It is so ordered. *Atwood, C. J., Gantt* and *White, JJ.*, concur; *Ellison, J.*, dissents in separate opinion in which *Ragland* and *Henwood, JJ.*, concur.

ELLISON J. (dissenting)—I respectfully dissent from that part of the principal opinion which holds the testimony of the witnesses Forquer, Easley and Sleath was competent and properly admitted by the trial court over appellant's objections and exceptions.

The undisputed evidence was that the deceased Moran lacked only a very little—one witness said about eight inches—of being in the clear when he was struck. It was the respondent's contention that the engineer, by a reasonably prompt application of the emergency brakes after seeing Moran in a perilous position, could have checked the speed of the train sufficiently to have saved him. The question narrows down to a matter of inches and a measure of time infinitesimally small. In other words, even though the jury might have

believed the arrival of the train at the point of collision could not have been delayed more than a fraction of a second or by a distance exceeding a few feet, let us say, yet, if there was evidence tending to show its advance could have been retarded that much the respondent could hold the appellant responsible. The jury found for her and it may have been on that ground.

In maintaining the affirmative of the issue the respondent presented the three lay witnesses Forquer, Easley and Sleath, who said that in July and August, 1927, some eight months after Moran was struck and killed at Rutledge, they observed the same train—that is a passenger train bearing the same number and running on the same schedule—make ordinary service stops on three occasions, once at the station of La Plata and twice at Hurdland, in a distance of 600 or 700 feet. The appellant objected repeatedly that the conditions existing when the witnesses made these obsrvations were not shown to have been sufficiently similar to the conditions existing when Moran was killed, to make the evidence competent and material; but the court overruled the objections.

■ The law is well established that when a party seeks to make proof of his case by introducing evidence of experiments or independent similar occurrences, not only must he show the causal conditions and circumstances of the event under investigation were substantially reproduced in the experiments or similar occurrences, 22 C. J. secs. 840, 842, pp. 751, 755; James v. Bailey Reynolds Chandelier Co., 325 Mo. 1054, 1071, 30 S. W. (2d) 118, 124; but the evidence must also be of such character and clarity as will assist the jury to an intelligent determination of the real issues of fact in the case before it. [22 C. J. secs. 843. 852. pp. 755. 758.] Considerations of what has been called ''collateral inconvenience'' or ''auxiliary policy'' enter in. 1 Greenleaf on Evidence (16 Ed ) secs 14-a, 14-v, pp. 37, 83: 1 Wigmore on Evidence (2 Ed.) secs. 42, 443, pp. 260, 784. ■ Such evidence draws collateral issues into the case and sometimes may confuse the jury, lead them aside, and impede the trial even though it possesses a remote. indefinite relevancy. ■ The burden is on the party who offers the evidence to show its competency, and it is the duty of the court to determine its admissibility. [22 C. J. secs. 844, 852. pp. 756, 758.]

There was testimony that the same kind of equipment had been in use on train 22 from the time Moran was killed until the date of the witnesses' observations—that is the type of engines, cars, brakes, etc. It was also shown the weather was clear and the rails dry on all four occasions; and that the track at the three stations named was similar in gradient and footage of straight track. So there was a sufficient similarity of conditions in these particulars.

■ But beyond that the facts are not necessarily parallel. One set of witnesses who saw the train that struck Moran estimated its speed when the engineer first saw him at forty to forty-five miles. The three witnesses, Forquer, et al., who made the observations at La Plata and Hurdland estimated the speed of the trains they saw at the same figures, forty to forty-five miles per hour. But assuming all these witnesses would gauge the speed alike yet there is a spread in their estimates of five miles per hour, or 7 1/3 feet per second, which might represent the difference between safety and disaster in the effective operation of the emergency brakes in a case as close as this.

Furthermore, the methods employed by the three witnesses in estimating the distance within which the trains they were watching came to a stop, were the crudest approximations so far as they described them. Their procedure on one of these occasions was as follows. Starting from the point where the engine customarily stopped at the station they paced off a distance of 1200 feet to their observation point. Standing there they noted the brakes were "applied" when about half the train's length had passed. Deducting that estimated half train length from the 1200 feet gave a distance of 675 feet *if* the engine stopped that day where it usually did and their measurements and estimates were accurate. But they did not say the brakes were hanging loose before they were "applied," which was the fact on the occasion when Moran was killed, whereas the appellant's engineer said, and there was no evidence to the contrary, that in making a service stop a light application of the air is made a long way in advance, which, of course, would take up the slack and make the brakes respond more promptly.

Beyond all this, the train that struck Moran had eight cars and was making an emergency stop, whereas the trains the witnesses observed at La Plata and Hurdland had eleven and fourteen cars and were making service stops. Now, how does the fact that eleven and fourteen-car trains made *service* stops in 700 feet or less, have any tendency to prove the distance in which an eight-car train ought to have made an *emergency* stop?

The respondent contends the two sets of facts can be reduced to a common denominator in this way. The appellant's engineer on cross-examination testified the longer the train the quicker it would stop, because of the added braking power. He said an eight-car train will run about 100 feet further than a fourteen-car train when the emergency brakes are applied. Respondent argues thus: the evidence shows an emergency stop can be made in less distance than a service stop; since the two fourteen-car trains were seen to make service stops in 600 or 700 feet, it consequently stands proven they would have stopped in less distance than that if the emergency

brakes had been applied; an eight-car train will run about 100 feet further than a fourteen-car train when the emergency brakes are applied; therefore, an eight-car train will stop under an emergency application in about 100 feet more than some unnamed distance less than 600 or 700 feet, which means in less than 700 or 800 feet; from all of which the jury were entitled to infer that the train at Rutledge could have been slowed up sufficiently to have avoided striking Moran.

In the opinion of the writer occurrences so dissimilar in their essential facts cannot be made competent merely because they may by such an intricate course of reasoning be given a vague relevancy to the issues on trial. But further than that, there was no evidence that a train will make an emergency stop in some *unnamed* distance less than a service stop. The evidence was definite on that point. The only two witnesses who testified concerning it were the appellant's engineer and fireman. They said on cross-examination an emergency stop requires one-third *less* distance than a service stop; and the engineer in another part of his cross-examination contradicted himself and said an emergency stop required one-third *of* the distance used in a service stop.

· In her brief, in discussing the demurrer to her evidence the respondent twice refers to and adopts this statement of appellant's engineer's that an emergency stop requires one-third of the distance necessary for a service stop, and she points out that one-third of a half mile is 880 feet. That ratio applied to the testimony of her witnesses Forquer, Easley and Sleath, who say they saw three eleven and fourteen-car trains travelling forty to forty-five miles per hour make service stops in 600 to 700 feet, would fix the distance in which the same trains would have made emergency stops at 200 to 233 feet, seventy-five yards or three car-lengths—a distance so short we would doubtless be justified in holding the testimony in conflict with physical laws. [Highfill v. Wells (Mo. Sup.), 16 S. W. (2d) 100, 103.]

But, having taken that position and adopted that ratio for one part of her case, respondent ought not to be permitted to change theories in attempting to connect up the testimony of the three witnesses mentioned by asserting an emergency stop requires some indefinite, *unnamed* distance less than a service stop. Even in resorting to the testimony of an adversary witness to help out her case she must be consistent. [Gann v. C. R. I. & P. Ry. Co., 319 Mo. 214, 228, 6 S. W. (2d) 39, 44, and cases cited.]

To sum up, the distance within which the train ought to have made an emergency stop at Rutledge was a vital issue. The deceased lacked only eight inches of being in the clear, and the question figures down to a knife edge. Three lay witnesses were intro-

duced who said they saw other trains of different lengths, at different times of the year and at different places, traveling "about" forty to forty-five miles per hour make a different kind of stop in "about" 600 or 700 feet. A fourteen-car train would be at least 1050 feet long exclusive of the engine, so this testimony amounts to a statement that these two trains traveling at high speed made service stops in less than six or seven-tenths of their length. Train speeds and distance were estimated except that the witnesses paced off the distance from the place where the engine usually stopped to the point where they made their observations. Then we are asked to apply that testimony to the accident, through the medium of admissions of appellant's engineer and fireman, which must be taken one way to harmonize with respondent's side of the case on one issue, and another way to harmonize with her version on another issue.

To say this controversy and indirection over a collateral matter, wholly outside the event under investigation, was helpful in determining the actual issues of fact in the case, seems to the writer to be going much too far. In my view it was prejudicial and led the jury afield If this is correct, the evidence was improperly admitted and the judgment should be reversed and the cause remanded. *Henwood* and *Ragland, JJ.*, concur.